**R.S.E., INC., d/b/a Harrisburg Asphalt Company and d/b/a Wellsboro Asphalt Co., Plaintiff,**

v.

**PENNSY SUPPLY, INC., Union Quarries, Inc., Hempt Bros., Inc., Silver Springs Construction Co., Kimbob, Inc., Robert M. Mumma, Robert M. Mumma, II, Max C. Hempt, Gerald L. Hempt, George F. Hempt, Bobali Corporation and 441 Corporation, Defendants.**

Civ. A. No. 77–0689.

United States District Court,
M. D. Pennsylvania.

Sept. 11, 1981.

Louis R. Koerner, Jr., New Orleans, La., Barry E. Carter, Washington, D. C., Thomas A. Beckley, Steven S. Schiffman, Beckley & Madden, Harrisburg, Pa., for plaintiff RSE d/b/a Harrisburg Asphalt and d/b/a Wellsboro Asphalt Co.

William D. Boswell, Jeffrey Boswell, Berman, Boswell, & Tintner, Harrisburg, Pa., Richard T. Franch, Terry Rose Saunders, Chicago, Ill., for defendants Pennsy Supply, Inc., 441 Corp., Bobali Corp., Kimbob, Inc., Robert M. Mumma, Robert M. Mumma, III.

F. Murray Bryan, Edward C. First, Jr., McNees, Wallace & Nurick, Harrisburg, Pa., Lewis Bernstein, McNees, Wallace & Nurick, Washington, D. C., for defendants Hempt Bros., Inc., Silver Springs Const. Co., Inc., Max C. Hempt, Gerald L. Hempt, George F. Hempt.

Thomas Silfen, Paul S. Ryerson, Arnold & Porter, Washington, D. C., for defendant Union Quarries, Inc.

## MEMORANDUM

RAMBO, District Judge.

To relate the history of this case *in toto* would require a Herculian effort on the part of the court, which is neither required nor warranted in this instance. Hence, this condensed, but satisfactory, version follows.

On August 2, 1977, plaintiff filed its complaint, alleging various violations of the antitrust laws and tortious interference with business relationships. Answers were timely filed thereto. An amended complaint was filed on November 14, 1977, and again answers were timely filed thereto. On June 8, 1978, after receiving approval by the court, plaintiff filed a second amended complaint, adding additional defendants.

Protracted discovery and pre-trial motions ensued for the next year and a half. On December 7, 1979, the court ordered that discovery be completed by February 22, 1980 and dispositive motions be filed by March 7, 1980. Pursuant to a request for extension of discovery period by plaintiff, the court, on February 22, 1980, extended the discovery deadline until March 22, 1980, with dispositive motions to be filed by March 31, 1980. On March 3, 1980, at the request of plaintiff, the date for filing of dispositive motions was again extended until April 4, 1980. A final extension requested by plaintiff was granted on May 1, 1980, giving plaintiff until June 5, 1980 to file dispositive motions and establishing the dates for response and reply briefs.

All of the defendants filed motions for summary judgment prior to the commencement of trial, which was June 2, 1980. On April 14, 1980, the court granted partial summary judgment in favor of defendants on the plaintiff's claims under sections 2(a) and 2(e) of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. §§ 13(a) and (e). 489 F.Supp. 1227. The counterclaims filed by various defendants were severed and a separate trial ordered thereon, by order dated May 28, 1980. On May 30, 1980, the court granted the motion for summary judgment by defendant Locust Point Quarries in regard to all claims under the antitrust statutes and dismissed, without prejudice, all state claims asserted against them. In addition, the court granted in part and denied in part, defendants' motions for summary judgment.

On June 2, 1980, the selection of the jury commenced and the trial opened on June 4, 1980. It proceeded at a snailspace through the months of June, July, August and September, with several motions by plaintiff to alter the witness list, add additional witnesses, and conduct allegedly limited discovery with respect to the Joseph Ciccone Co., an allegedly comparable firm. On September 12, 1980, plaintiff was ordered to proceed with calling his witnesses in the order listed in plaintiff's August 12, 1980 witness list.

By late September 1980, plaintiff was foundering in its attempt to present a viable study on damages as a result of stone overcharges and requested an opportunity to revise its lost profit damage study. Plaintiff was given until September 25, 1980 to submit a revised study. Voir dire of the damage study disclosed several major errors in plaintiff's damage model and plaintiff was again permitted to make revisions. Permission to file several additional revisions was requested by plaintiff and granted by the court, with the final ruling by the court on a lost profit damage model being made on November 14, 1980. Plaintiff rested its case in chief on December 5, 1980. Both plaintiff and defendants moved for a directed verdict at the close of plaintiff's case; defendant Bethlehem Mines' motion was granted on all claims, the remainder of defendants' motions were granted in part and denied in part, and plaintiff's motion was denied.

Defendants began to present their case in defense on January 19, 1981 and concluded their defense on February 19, 1981. Plaintiff commenced its rebuttal testimony on February 20, 1981 and closed its case on March 13, 1981. Motions for directed verdict were reasserted by both plaintiff and defendants at the conclusion of all the evidence. The jury was charged on March 21, 1981 and returned a hung verdict on all but one claim on March 31, 1981.

Motions for judgment notwithstanding jury's failure to reach a verdict (hereinafter referred to as n. o. v.) were filed by both plaintiff and defendants as per the court's instructions and an expanded briefing schedule was established, which afforded all parties more than adequate time to present their respective arguments. Appropriate response and reply briefs have been filed and the court is now in a position to decide the respective motions for judgment n. o. v.[1]

■ It is undisputed that in ruling on Rule 50(b) motions, the court "must consider the record as a whole and in the light most favorable to the non-moving party, drawing all reasonable inferences to support its contentions." *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 115 (3d Cir. 1980); *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 25 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979). A corollary to that holding is the fact that in order to find in favor of the plaintiff on a motion for judgment n. o. v., plaintiff must prove all of the elements of the offense, whereas a defendant may prevail on a motion for judgment n. o. v. if it can prove any element has not occurred.

*Plaintiff's Motion for Judgment n. o. v.*

In its brief in support of its motion for judgment n. o. v., plaintiff addresses the following:

1. The joint sales agency between

 a. Pennsy Supply, Inc. (hereinafter Pennsy) and Union Quarries, Inc. (hereinafter Union); and

 b. Pennsy and 441 Corporation (hereinafter 441).

2. Price fixing on stone between Pennsy and Hempt Brothers, Inc. (hereinafter Hempt).

3. Concerted refusal to deal by all defendants.[2]

4. Attempted monopoly of blacktop and stone aggregate by Pennsy and Hempt individually.

5. Conspiracy to monopolize the production of blacktop and stone aggregate between Pennsy, Hempt and Union.

---

1. Even though the court, at the close of all of the evidence, denied both plaintiff's and defendants' motions for directed verdict, the court is "deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Rule 50(b) of the Federal Rules of Civil Procedure.

2. Defendants still remaining at the time the case was submitted to the jury were as follows: Pennsy Supply, Inc., Union Quarries, Inc., Hempt Bros., Inc., Silver Springs Construction Co., Kimbob, Inc., Robert M. Mumma, Robert M. Mumma, II, Max C. Hempt, Gerald L. Hempt, George F. Hempt, Bobali Corporation and 441 Corporation (hereinafter referred to as defendants).

The court will briefly address each of these claims *seriatim*, in light of plaintiff's burden to show all of the elements required to prove each claim.

*Joint Sales Agency*

■ Plaintiff's key premise in this allegation is that the joint sales agency between Pennsy and Union and Pennsy and 441 constituted a price fixing technique and was a *per se* violation of § 1 of the Sherman Act. In support of classifying the joint sales agency as a *per se* offense, plaintiff cites L. Sullivan, *Handbook of the Law of Antitrust* (1977), which states:

> An arrangement involving a partial integration of functions, which may achieve significant economies of scale among competitors, also may escape *per se* treatment, even though it eliminates price competition between the firms that participate in it. To qualify for the application of the rule of reason, the arrangement must have the following two characteristics: first, the elimination of price competition between the participating firms must result directly from the partial integration of their functions; second, this elimination of price competition must not appear to significantly reduce market-wide competition. When these two conditions are met, the arrangement is not characterized as a price restraint and its legality is determined only after a full analysis to determine the extent of any reduction in competition and the extent to which integration benefits may be obtained. *Id.* at 206.

Plaintiff contends these two conditions are not met in the instant case and therefore the joint sales agency should be classified as a *per se* offense.

With this the court cannot agree. There is no question that any elimination of price competition was a direct result of the partial integration of functions of the respective firms. Further, the potential elimination of price competition did not have a significant reduction in market-wide competition because of the number and size of other competitors, who would gladly have underbid Pennsy, Union, or 441 if their bids became uncompetitive. For these reasons, the court is compelled to evaluate the joint sales agency under a rule of reason approach.

■ The court does not agree with defendants Pennsy, Union, and 441 that the "intraenterprise conspiracy doctrine" applies in the instant case. However, as discussed below, plaintiff's claim fails under the rule of reason test for another reason. In analyzing a restraint under the rule of reason, the court must determine whether the relevant markets, defined as both geographic and product market, are unreasonably affected. This can be accomplished by applying a percentage test or by analysis of the market structure. 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 6.02[4][c][i] (1981). Plaintiff adduced no competent evidence to show that the relevant geographical market, which was defined by the jury as something larger than the "yellow blotch" proffered by plaintiff, was unreasonably affected. The figures from the Coopers and Lybrand study, specifically Exhibit IV (designated as R5177.2) do not bear out plaintiff's assertion that defendants Pennsy, Union, and 441 had nearly half of the *relevant* geographic market because the study did not cover only the area designated by the jury as the relevant market and no other data existed to determine the effect on the relevant market. Without *competent* evidence to show what effect would have resulted in the *relevant* geographic market, plaintiff could not prove that the joint sales agency was a violation of § 1 of the Sherman Act when viewed by the rule of reason test. *See*, 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 6.02[4][c][i] and [ii] (1981). For these reasons, plaintiff's motion for judgment n. o. v. on the joint sales agency issue will be denied.

*Price Fixing of Stone*

■ Plaintiff's allegations that Pennsy and Hempt engaged in price fixing is initially supported by plaintiff by pointing to the testimony of Ms. Romayne Horne.

Plaintiff contends that Ms. Horne's testimony is unrebutted and clearly proves a conspiracy to fix prices existed between Pennsy and Hempt. Taken at best, all that Ms. Horne's testimony proves is that published price lists were exchanged by Pennsy and Hempt, which Hempt used in forming its own price lists, and that officials from Pennsy and Hempt had conversations on an infrequent but regular basis.[3]

Defendants Pennsy and Hempt countered this testimony with that of Mr. Hempt and Mr. Mumma who testified that they never entered into a conspiracy to fix prices, that they did have telephone conversations concerning the price of stone but that these related to legitimate sales between Pennsy and Hempt, and that because each were customers of the other on occasion, published price lists were sent out. Taken in the light most favorable to defendants, Ms. Horne's testimony *clearly* does not support the granting of a judgment n. o. v. on price fixing for plaintiff.

Plaintiff next contends that the testimony of Dan Grove shows there was a conspiracy to fix prices on behalf of Pennsy and Hempt. This contention is best addressed by subsequent testimony of Dan Grove which reads as follows:

Q. Mr. Grove, do you remember depositions of September 13, 1978. At that time you told me, did you not, that you had no knowledge or information concerning the price fixing of stone. Isn't that correct?

A. That's true.

Q. And you had no knowledge or information concerning the price fixing of cement concrete, isn't that correct?

A. Yes.

Q. And you had no knowledge or information concerning price fixing of asphaltic concrete, isn't that correct?

A. Yes.

Q. Do you remember at that deposition you testified that you had no knowledge or information concerning any improper acts of Max Hempt. Is that correct?

A. Yes.

(Transcript, Vol. 11, p. 1638–39.)

The totality of Mr. Dan Grove's testimony cannot support the granting of judgment n. o. v. for plaintiff on its price fixing claim as it is conflicting at best.

Plaintiff also argues that the discussion of stone prices by the Hempts and Mummas at the board of directors meetings of Union establishes a price fix. Plaintiff contends this shows the explicit exchange of pricing data by officials of defendant companies. This argument is perhaps the most convincing one presented by plaintiff and the one that is most perplexing to the court. To rebut this testimony, defendants proffer the testimony of Wally Lewis, the fifth director of Union, who testified that Union's prices were set strictly on its costs and that neither Hempt's nor Pennsy's prices were discussed at these meetings. Defendants contend this is just more of the "opportunity" evidence and that such evidence, even when coupled with parallel business conduct, is not necessarily probative evidence, citing *Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457 (7th Cir. 1981).

While the court does not agree with defendants that such testimony could not be the basis for a decision in favor of plaintiff by a jury, it cannot say that a jury could not reasonably conclude otherwise, which is what the court must find if it is to grant plaintiff's judgment n. o. v. Because it is a jury question and because there is conflicting evidence, the court cannot grant plaintiff's motion on that basis.

Plaintiff's final contentions are that Pennsy and Hempt submitted identical or very similar bids and had very similar price lists. Taking into consideration the testi-

---

**3.** Ms. Horne's testimony was fraught with inconsistency and vagueness. She remembered the use of Pennsy's price list each year for twelve years, yet documents show Pennsy made new price lists in only five of the twelve years. She could not remember any specific dates or times phone calls were made, answering "between 1965 and 1977." She could not remember any specifics as to conversations, only that the topic involved the prices of stone.

mony of Ronald Nye, wherein he explained why the small differential in the bids of certain townships (Transcript Vol. 25, pp. 18–26), and the fact that the goods in question were fungible goods which are conducive to comparable if not identical prices, the court again cannot determine factual questions where *material facts remain in dispute.* Such determinations are undeniably in the sole province of the jury.

Accordingly, plaintiff's motion for judgment n. o. v. for price fixing of stone between Pennsy and Hempt must be denied.

*Concerted Refusal To Deal*

■ One of the key elements that must be proven in a concerted refusal to deal is the agreement or conspiracy of those allegedly refusing to deal. Plaintiff has proffered no direct testimony of a concerted refusal to deal or to deal only on discriminatory terms. Likewise, plaintiff has failed to provide circumstantial evidence sufficient to prove the existence of parallel conduct, a concept often used to assist plaintiff in its burden of showing *concerted* action. In *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205 (3d Cir. 1981), the court addressed the concept of parallel behavior, stating

> To establish consciously parallel behavior, a plaintiff must show (1) that the defendants' business behavior was parallel, and (2) that the defendants were conscious of each other's conduct and that their awareness was an element in their decisional process. *Id.* at 208.

Plaintiff has failed to prove that the defendants' conduct was in fact parallel.

Assuming, *arguendo,* that plaintiff had proven defendants' conduct to be parallel, that standing alone does not prove concerted refusal to deal. Courts have held time and again that parallel business behavior, without more, does not prove concerted activity. *Schoenkopf, supra; Weit, supra; Venzie Corp. v. U.S. Mineral Products Co.,* 521 F.2d 1309 (3d Cir. 1975). In *Schoenkopf, supra,* the court specifically held that, "Absent such additional evidence a directed verdict or a judgment notwithstanding the verdict should be granted." *Id.* at 208.

Further, plaintiff's own brief establishes a material fact in dispute, albeit unintentionally. Plaintiff states

> There is no controversy concerning (sic) that substantial business relationships existed between RSE, Inc. and Hempt and Pennsy prior to the general knowledge that plaintiff was going to erect a blacktop plant. These included the sale and hauling of asphaltic cement, subcontracting of motopaving services, and trucking services. Similarly, there is no controversy concerning the curtailment of all such business relationships. (Plaintiff's brief in support of judgment n.o.v. at pp. 24–25.)

Plaintiff implies that prior to Pennsy and Hempt gaining knowledge that plaintiff would directly compete with them they were willing to provide services to plaintiff. Subsequent to learning of plaintiff's intentions, the business relationships were curtailed. As defendants have pointed out, they need not subsidize a direct competitor. Defendants' actions were at least as probative of sound independent business reaction as they were of concerted refusal to deal.

Plaintiff's motion for judgment n.o.v. on the issue of concerted refusal to deal will be denied.

*Conspiracy to Monopolize*

Plaintiff's claim of conspiracy to monopolize suffers from the same deficiency as its claim for concerted refusal to deal, namely no unrebutted proof of concerted behavior. (See Refusal to Deal section, *supra.*)

*Attempted Monopoly*

Last and least impressive is plaintiff's argument that Pennsy and Hempt attempted to monopolize and that Pennsy, Hempt and Union conspired to monopolize the sale and use of stone aggregate and the production of blacktop in the *Harrisburg* area.

■ As correctly pointed out by defendants, a § 2 claim for attempted monopolization requires a showing of a specific intent to monopolize and sufficient market power to come dangerously close to success. *Harold Friedman, Inc. v. Kroger Co.,* 581

F.2d 1068 (3d Cir. 1978). Essential to the proof of the second element is the showing of the market shares in the *relevant* market. As pointed out by the court previously, plaintiff's documentation as to market share relates to the Harrisburg area, which was originally defined as a 25 mile radius from downtown Harrisburg. Plaintiff then proffered the "yellow blotch" as the relevant market, without making a showing of the respective percentage shares of competitors in that market. The jury, however, established as the relevant market, an area larger than but including the "yellow blotch." It is inconceivable to the court how plaintiff can seriously move for a judgment n.o.v. on the issue of attempted monopoly when absolutely no *competent* evidence was proffered for the jury to consider regarding the shares in the relevant market as found by the jury.

Accordingly, plaintiff's motion for judgment n.o.v. on the claims of attempted monopoly and conspiracy to monopolize will be denied. For the reasons set forth more specifically in the preceding sections, plaintiff's motion for judgment n.o.v. will denied *in toto.*

### Defendants' Motion for Judgment n.o.v.

Having come to the conclusion that plaintiff's motion for judgment n.o.v. is not warranted in regard to any of the claims advanced by the plaintiff, the court must now address whether defendants' motion for judgment n.o.v. has merit with regard to any claims.

In their motion for judgment n.o.v. filed on April 9, 1981, defendants moved, in paragraph 1, for "judgment on all plaintiff's claims under Sections 1 and 2 of the Sherman Act on the ground that plaintiff failed to present evidence from which a jury could determine, without speculation, the injury, if any, suffered as a result of the alleged violations. In paragraphs 2 and 3, defendants challenged the evidence to support a finding for plaintiff on the Section 2 attempted monopoly charge and the Section 1

refusal to deal claims, respectively. Paragraph 4 contained defendants' motion for judgment n.o.v. on the state law claims, challenging liability and damages. Plaintiff argues that some of these issues, namely those in paragraphs 2 and 3, were not raised in defendants' motion for directed verdict at the close of all evidence, therefore cannot be considered pursuant to Rule 50(b) and the applicable case law of this circuit. *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9 (3d Cir. 1976); *Beebe v. Highland Tank & Manufacturing Co.*, 373 F.2d 886 (3d Cir.), *cert. denied sub nom. National Molasses Co. v. Beebe*, 388 U.S. 911, 87 S.Ct. 2115, 18 L.Ed.2d 1350 (1967). Plaintiff also challenges defendants' ability to raise the issues of "whether there was the fact of damage" and "whether the damage evidence besides the Wilcox report was sufficient to provide reasonable damage estimates."

Because the court did not consider the issues raised in paragraphs 2 and 3 of defendants' motion for judgment n.o.v., whether defendants could properly raise them becomes moot. With regard to the other issues, the court disagrees with plaintiff's contention that these were not raised by defendants in a motion for directed verdict at the close of all the evidence. Plaintiff's damage studies, whether they be referred to specifically as the Wilcox damage model, reference schedules, beachhead models, or whatever, were repeatedly and hotly contested by defendants at every opportunity, including the close of plaintiff's case, the close of all evidence, and on motion for judgment n.o.v. The only possible exception being a challenge to plaintiff's damages resulting from stone overcharges, which will be addressed later in this memorandum.[4]

Defendants, in their memorandum in support of their motion for judgment n.o.v., argue that plaintiff has failed to present a *reasonable* damage model or *reasonable* damage data so that the jury could not

---

**4.** Plaintiff did not specifically object to this in its reply brief filed on July 3, 1981, but did refer to this in a brief filed in support of a motion for leave to file a supplemental brief on August 17, 1981.

arrive at a *reasoned* damage award, assuming that liability is established. Instead, the defendants contend, the jury would have had to rely on guesswork and speculation. Plaintiff argues in its memorandum in opposition, that it need not show the exact losses caused by defendants' alleged illegal activity but that the jury may make a reasonable and just estimate of damages based upon relevant data. This question of proof regarding damages must be placed in its proper perspective.

There appears to be some confusion regarding the degree of specificity and exactness required to be proven by a plaintiff in a private antitrust action for damages. A major cause of that confusion is that distinctions are not properly drawn and maintained between proof of the fact of damage, proof of the cause or causes of damage, and proof of the amount of damage. This distinction was pointed out by the Supreme Court in *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). In that case, the Court combined the proof of fact of damage and the proof of causation of damage into one category (presumably assuming that damages did in fact occur), placing the proof of amount of damages in another category. The Court then held that the measure of proof required for the two categories varied, stating

> ... there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. *Id.* at 562, 51 S.Ct. at 250. (Citation omitted.)

In *Story*, the Court established that a lesser measure of proof is required to prove the amount of damages, *once damage in fact and causation are clearly established.* The fact that a lesser degree of precision is needed to establish the amount of damages was articulated by the court in *Van Dyk*

*Research Corp. v. Xerox Corp.*, 631 F.2d 251 (3d Cir. 1980), wherein the court held

> It also is necessary to bear in mind that the evidence linking illegality and injury must be more precise than that needed to establish the amount of damages. *Rea v. Ford Motor Co.*, [497 F.2d 577 (3d Cir.)] *supra.* In the latter context, the Supreme Court has held that the fact finder is allowed to act upon probable and inferential, as well as direct and positive proof. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–66, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946); see *Zenith Radio Corp. v. Hazeltine Research, Inc. supra*, 395 U.S. [100] at 123–25, 89 S.Ct. [1562] at 1576–77 [23 L.Ed.2d 129 (1969)]. Although the district court also found that the plaintiff failed to meet the more lenient test in proving the amount of damages, we confine our review to the issue of fact of injury. *Id.* at 255. (Footnote omitted.)

Several other cases decided by the Court have added further refinements to this distinction.

In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), the Court, in addressing the measure of proof required to show the amount of damages, once damage in fact and causation have been determined, held that the factfinder may

> ... conclude as a matter of just and reasonable inference from the *proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from evidence in the decline of prices, profits and values, not shown to be attributable to other causes*, that defendants' wrongful acts had caused damage to the plaintiff. *Id.* at 264, 66 S.Ct. at 579. (Emphasis added.)

It is clear from this statement that the "just and reasonable inferences" may be used to establish the amount of damages only when the damage is caused by defend-

ants' wrongful acts and not from some other cause. The Court in *Bigelow, supra,* then went on to give the following caveat:

> ... even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. *Id.* at 264, 66 S.Ct. at 579–80.

This rationale was reiterated again by the Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969).

In this case, defendants do not contest the fact that plaintiff did suffer damages. What they do contest is the causation of the damages (i. e. that the cause of plaintiff's damages was not defendants' alleged unlawful activities in violation of the antitrust statutes, but that plaintiff's losses were caused by plaintiff's mismanagement, adverse economic conditions and lawful competition) and the amount of damages (i. e. whether plaintiff could have achieved 25% of the blacktop market and sustained a 25% net profit figure while doing so in a market that was undergoing severe contractions). In applying the applicable case law as set forth by the Supreme Court to the facts of the instant case, the court, then, must address the issues of proof of causation of the damages and the proof of amount of damages, applying the respective measures of proof to each.

In attacking plaintiff's lost profit damage model, defendants assert the following arguments:

1. The overall results are incredible, not based upon reason.
 a. Plaintiff did not use the best year ever but fragmented the business to use the best in each segment.
 b. Plaintiff unrealistically projected it would obtain 25% of the road construction market in a market that decreased nearly 25% from 1973–1977.
 c. Plaintiff, without any credible or comparable data, projected a 25% net profit from its overall operations.

2. Plaintiff ignored economic and competitive factors completely.
 a. Plaintiff's damage model failed to account for changed economic conditions from 1974 to 1977.
 b. Plaintiff's damage model fails to consider the effect lawful competition would have had on the amount of damages.
 c. Plaintiff's damage model fails to consider the institution of the Skid Resistance Level (SRL) stone in 1975 by Pennsylvania Department of Transportation.
 d. Plaintiff's damage model does not account for the demise of Cumberland Construction Company in 1974.

3. Plaintiff's damage model failed to provide an alternative basis for a damage award.
 a. Plaintiff encouraged the jury to speculate by presenting a large but unrealistic damage model.
 b. Plaintiff presented no raw data that the jury could formulate damages on a reasoned basis on its own.

Applying the law as defined by the Court in *Story* and its progeny, it is apparent that the arguments made by defendants in paragraph 2 above attack the causation of damages, not amount of damages, and therefore require a higher measure of proof. For that reason, the court will address the arguments raised in paragraph 2 first.

*Causation of Damages*

In private antitrust actions, the burden is placed upon the plaintiff to show that the damage claimed was in fact caused by the unlawful acts of the defendant and did not result from some other factor, such as management problems, a recession in the economy or lawful competition by the defendant. *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251 (3d Cir. 1980); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 435 (N.D.Cal.1978), *aff'd, Memorex Corp. v. I.B.M. Corp.*, 636 F.2d 1188 (9th Cir. 1980). The Court of Appeals of this circuit, as well as others, has specifical-

ly held that where a plaintiff's projections fail to consider the probable effects of lawful competition and changed economic conditions, a jury cannot rationally reduce the damage estimate to reflect these changes and therefore any amount they may award would be based upon speculation and guesswork. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841 (N.D.Cal. 1979), *aff'd*, 654 F.2d 1256 (9th Cir. 1981); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423 (N.D.Cal.1978), *aff'd*, *Memorex Corp. v. I.B.M. Corp.*, 636 F.2d 1188 (9th Cir. 1980).

■ Defendants argue that plaintiff failed to consider the drastically changed economic conditions surrounding the blacktop production and road construction markets in the Harrisburg area during the period from 1974 to 1977, which were immediately following the beachhead years used by plaintiff in its damage model. Defendants further allege that here, as in *Van Dyk*, *Murphy* and *ILC*, the plaintiff failed to account for *any* lawful competition that may have been spawned by plaintiff's intention to capture 25% of a declining market.[5] Plaintiff argues that the damage study was a well prepared document calling on the expertise of three CPA's and a lawyer-economist who specialized in industrial organization economics and antitrust matters. Plaintiff further asserts that the damage model was based upon actual share of the market for blacktop production and therefore would reflect the decrease in the amount of blacktop production from 1974 through 1978. Plaintiff did not address the effect lawful competition may have had upon its damage model, choosing instead to throw the ball back in defendants' court by

citing *Story Parchment* for the proposition that damage estimates need not be perfect.

To begin with, plaintiff's reliance on *Story Parchment* is totally inappropriate since the issue raised is *causation* of damages, not amount of damages. Moving to plaintiff's allegations that the damage model was painstakingly prepared by experts and professionals, one need only look at what these individuals used for their basic premises to see that this factor did not assure changed economic conditions were considered. For instance, Mr. Wilcox, after whom the damage study was named, testified that it was Mr. Robert Rimmer's idea to use 1973 as the base year for road paving but 1974 as the basis for blacktop production. Mr. Wilcox testified as follows:

A. My role as an accountant, I take certain assumptions and I am saying that Mr. Bob Rimmer could explain why he gave me that assumption to work with.

Q. So, this is an assumption that was given to you by Bob Rimmer, is that right?

A. That's right.

Q. So, you didn't express any independent opinion on the validity of this assumption, is that correct?

A. I do have personal knowledge of why it was chosen, because I discussed it with him.

Q. I want to know, do you have any independent opinion, have you analyzed this situation yourself?

A. Yes, sir.

Q. Thoroughly enough so that you think 1973 is the right base year for the road paving projection but 1974 is the right year for—the right base year for the projection for hot mix?

---

**5.** Defendants also argue that the institution of SRL grading in 1975 and the demise of Cumberland Construction Company in 1974 were also factors that could have adversely affected plaintiff's business. The court agrees that the former argument has merit, particularly in light of plaintiff's difficulty in securing adequate amounts of stone "in spec" to compete in the state road construction market. This factor alone could have materially affected the net profit per ton due to increased trucking costs to obtain the required stone. The court agrees with plaintiff, however, that the demise of Cumberland Construction Company was not a material factor since most equipment and personnel carried over to RSE. One notable exception being Donald Rimmer, whose experience may have had some impact but not sufficient to be fatal to the damage model.

A. No, I couldn't go into that much detail.

(Transcript Vol. 53, pp. 11041–42.)

Mr. Lovett, the lawyer-economist, was not qualified as an expert for road construction or blacktop production, let alone someone knowledgable about the Harrisburg area market. Therefore plaintiff's assertion that because these experts prepared the model it must have allowed for changed economic conditions is without foundation.

Likewise, plaintiff's contention that because the damage model used plaintiff's actual share of the blacktop production in the Harrisburg area the damage model automatically accounted for changed economic conditions is meritless. While the share of the blacktop production market may have been accurately reflected, the net profit derived from that production made no compensation for a depressed market but was calculated for a "boom" year.[6] Certainly, plaintiff does not seriously contend that no change in per unit net profit is encountered when one moves from a "boom year" to a market constricted by at least 25%. The American car manufacturers can readily attest to the fallacy of that assumption.

Perhaps the most blatant defect in plaintiff's damage model for lost profits is its failure to account for any lawful competition. Surely plaintiff cannot have expected the defendants to sit idly by while it proceeded to grasp 25% of the road construction market and maintain its roughly 12% of the blacktop production market, when each market began to dry up. As defendants point out, they were well integrated, established firms in the area. To postulate damages on the assumption that they would not individually react by reducing their prices and therefore require plaintiff to further reduce its price, thus reducing its net profit, is absurd. Nor did plaintiff present any evidence from which the jury could, without speculation, determine what the affect of lawful competition would have been and reduce the damages accordingly.

In short, the court concludes that plaintiff's damage model for lost profits was defective in that it made no provision for the effects of lawful competition, did not properly allow for the changed economic conditions of the relevant markets, and did not "assure to a reasonable degree that its (plaintiff's) alleged damages, . . . did not result from factors other than the alleged illegal acts of Xerox (defendant)." *VanDyk Research Corp. v. Xerox Corp.*, 478 F.Supp. 1268, 1327–8 (D.N.J.1979), *aff'd. on other grounds*, 631 F.2d 251 (3d Cir. 1980), citing *Coleman, supra; Murphy, supra* ; and *ILC Peripheral, supra.*

### Amount of Damages

Even assuming, *arguendo,* that plaintiff's lost profit damage model correctly allowed for changed economic conditions and lawful competition, defendants contend that the model could not withstand even the lesser test applied to the measure of proof of amount of damages as set forth in *Story Parchment, Bigelow,* and *VanDyk.* In fact, the major thrust of defendants' judgment n.o.v. is aimed at the unreasonableness of the amount of damages claimed in plaintiff's lost profit damage model.

Defendant describes the overall results of plaintiff's damage model as incredible and not based upon reason in that it did not choose the best year for both of plaintiff's segments of its business but chose the best year for the blacktop production and the best year for road construction; it projected an unattained and unrealistic 25% of the declining road construction market and it applied, without justification, an unheralded 25% net profit ratio. Plaintiff argues that the selection of different base years for different segments of its business is justified and reasonable; that the projection of 25% of the road construction market was realistic and did not exceed the bounds of proper estimation as defined in *Bigelow, supra,* and *C. Albert Sauter Co., Inc. v. Richard S. Sauter Co., Inc.,* 368 F.Supp. 501 (E.D.Pa.1973); and that defendants' reference to 25% of the road con-

---

**6.** Defendants also attack the net profit figure of $2.90 per ton on blacktop production. Since that goes toward the amount of damages, it will be discussed in that section of the opinion.

struction market is misplaced, that the real issue is road construction *revenues*, of which plaintiff projected only 12%.

*Using Different Base Years*

At first blush, plaintiff's reasons for selecting 1973 as the base year for the road construction segment of its business and 1974 as the base year for blacktop production appears reasonable. Karl Wilcox, plaintiff's expert witness, testified they were the appropriate years and Robert Rimmer and Walter Rimmer both testified as to the reasons why different years should be used. However, upon closer scrutiny, the generalizations lose their credibility and the justification disappears. Mr. Wilcox testified that he feels the use of split years is appropriate, this was based upon the explanations given to him by Robert Rimmer and did not stem from an objective or independent accounting or economic evaluation. (Transcript Vol. 56, p. 11,621.) In essence then, the justification for using the different years hinges upon the testimony of Mr. Robert Rimmer.[7]

Mr. Robert Rimmer indicated on direct examination that the reason for using 1973 for road construction was because that was their first year in actually putting down the asphaltic concrete (Transcript Vol. 53, pp. 11,803-4) and that in 1974 RSE met "hard competition," (Transcript Vol. 53, p. 11,089).

To justify the use of 1974 as the base year for profits in the blacktop production, Mr. Rimmer testified as follows.

Q. Let's move to the hot mix market. Why did you use the year 1974 as the beachhead year in this study?

A. Well, I didn't want—when I went back over it, I didn't want to use '71, back over history. I didn't want to use '71, because '71 we just started up towards the end of the year ran enough tons to come up with formulas for the asphalt plant.

1972 was tied up with the Jones job and we were feeling our way along.

1973 we went into the market, being our own best customer.

---

**7.** Mr. Walter Rimmer's testimony was essentially corroborative of that given by Mr. Robert

By 1974, I thought we had our feet on the ground and a good source of supply with our stone from Bethlehem Mines, had our formulas all approved and we had worked out the bugs.

. . . . .

Q. In 1975, why did you not use 1975 as part of your hot mix beachhead year?

A. '75 was when we started experiencing trouble obtaining stone from Bethlehem and I could not bid the townships and the State the way that I had done in 1974.

(Transcript Vol. 53, pp. 11,089-91.)

The court, upon reflection, is of the opinion that just because RSE met "hard competition" in 1974 in the road construction business is not a reasonable justification to select 1973 instead of 1974. In addition, on cross-examination, Mr. Rimmer contradicted his statement that in 1973, RSE actually "laid down" a substantial portion of asphaltic concrete, indicating he had not made an analysis to determine the percentage "laid down" by RSE in 1973 as opposed to the percentage "laid down" by Cumberland Construction, a forerunner to RSE.

MR. FRANCH: I'm trying to establish, Your Honor, that this witness cannot possibly tell us today the extent to which Cumberland was a subcontractor for R.S.E. to do road paving work in 1973, the year that they chose, that Mr. Rimmer chose as the model year.

MR. KOERNER: I think it is irrelevant.

MR. FRANCH: All right. Let me withdraw that question.

MR. CARTER: How is the exact percentage relevant as—

THE COURT: He's withdrawn the question.

MR. FRANCH: Let me withdraw the question.

BY MR. FRANCH:

Rimmer, who was the President of RSE.

Q. Have you made any attempt to determine the extent to which Cumberland was a subcontractor to R.S.E. for lay down work during the year 1973?

A. I didn't have to when I made up my mind about that. I knew exactly what I charged—or Cumberland charged me for the lay down.

Q. Did you do it? Did you make the analysis? That is all I want to know.

A. As to what percentage Cumberland laid down, no, I did not.

(Transcript Vol. 53, p. 11,102.)

As to Mr. Rimmer's explanation for the use of 1974 as a base year for blacktop production, there is no reason why 1973 would not have been just as desirable because RSE was established in the market, even if they were their own best customer.

Perhaps the most convincing argument why the use of 1973 as a base year for road paving and 1974 as a base year for blacktop production is *not* reasonable is shown by the following graphic illustration.

| | 1973 | 1974 | Total |
|---|---|---|---|
| Road Paving | $101,741 | $(294,545) | $(192,804) |
| Hot Mix | (2,411) | 191,693 | 189,282 |
| Total | $ 99,330 | $(102,852) | $ (3,522) |

By using the best year for each segment of its operations, plaintiff arrives at a profit figure of $293,434, or nearly three times as much as it actually made in any given year.[8] Given the specious reasons for the use of the split base year, the fact that some of the reasons were directly contradicted by Mr. Rimmer in his cross-examination, and the unreasonable and highly unfair results of using the split years, the court is of the opinion that the lost profits damage model, which was prepared using the split years, could not possibly be the basis for a jury to arrive at "reasoned" damage award, free of guesswork or speculation. Plaintiff's citation of the cases that indicate it may use the highest single year as a base period is correct; but to stretch that law to cover this factual situation, where no *single* year was used but the best portion of two years, is not warranted. The unreasonableness of plaintiff's damage model does not stop there.

*Projected Market Shares*

In establishing the percentages of the market it should have obtained absent defendant's alleged unlawful conduct, plaintiff contends that it did not use 25% as its projected share of the road construction in the Harrisburg market (which was not the relevant market as defined by the jury) but instead used a figure nearer to 12%.[9] As defendants point out in their reply brief, this "is certainly going to come as a jolt to Mr. Wilcox." (Defendants' reply brief, p. 4). Defendants then produced Mr. Wilcox's testimony wherein he was explaining the lost profit damage model to the jury, which reads as follows:

Column 1 is the 25 percent share of tonnage that we discussed on some of the other schedules. This is 25 percent of the Harrisburg area demand. . . .

Column 4 is obtaining a percentage increase of 25 percent clear tonnage over actual tonnage. In other words, in 1973, the 25 percent Harrisburg area share tonnage was 44,000 tons. . . .

Now, instead of selling [$]267,000 which was actual, R.S.E. should have sold or could have sold $691,000. This is in-

---

8. This graph is corroborated by the testimony of plaintiff's expert Mr. Wilcox at Vol. 56, pp. 11,618–20.

9. Plaintiff altered its position since trial and now asserts that the proper measure of losses for road construction should be based upon total revenues for road construction by the various firms engaged therein. Plaintiff contends the road construction revenues generated from plaintiff's projected share of the road construction comes to less than 12% of the total road construction revenues. Plaintiff then states that not all the road construction reve-nues were generated by blacktop paving, which is an understatement with respect to Hempt Bros. in particular. Plaintiff's novel but blatantly erroneous contention requires little discussion. Defendants best sum it up by describing what plaintiff in fact did:

Plaintiff took all the blacktop tonnage in what it called the area, gave itself 25 percent, and based the computation of lost sales thereon. If that's not a 25 percent market share, then Karl Wilcox must have been testifying in the wrong courtroom. (Plaintiff's reply brief, p. 5).

creased sales. This is the total sales with 25 percent Harrisburg share of the demand." (Transcript Vol. 55, pp. 11,450–51.)

In addition, plaintiff's counsel referred to the "25% demand share" continually in prior examination of Mr. Wilcox. (Transcript Vol. 55, pp. 11,403–411.) [10] It is incredible to believe that plaintiff can now argue that it did not use 25% of the total road construction in the Harrisburg market as a projection for output it should have had in its lost profit damage model.

Now that it has been established that plaintiff did in fact use 25% of the road construction in its calculations to arrive at lost profits, the question remains was such an assumption reasonable. Mr. Wilcox described the analysis that was used in arriving at the 25% figure, indicating they started with 33% because there were only three large producers in the Harrisburg market, Pennsy, Hempt and RSE, but decided to reduce it to 25% to be more conservative. (Transcript Vol. 54, pp. 11,261 to 11,264.) There is absolutely no reliable evidence to show that RSE could have obtained more than its actual share of the market, roughly 12%. Mr. Wilcox's references to comparable firms such as Ciccone, are simply not persuasive because he was not competent to testify whether Ciccone and RSE were comparable or whether the market in which Ciccone was located was comparable to the Harrisburg market.

Further, plaintiff asserts that an alternative approach was used in road construction sales, in which plaintiff's actual sales, not a 25% share was used. (Reference 6, R–5155.-3.) However, as defendants point out, plaintiff treats this not as an alternative to

Reference 5 (R–5155.2) but combines the two references to show a cumulative effect on its summary sheet, Reference 8 (R–5155.5), which was presented to the jury.

There is no basis for the assumption that plaintiff would have obtained 25% of the road construction in the Harrisburg area had they not been met with defendants' alleged unlawful competition.

*Projected Net Profit Percentages*

Defendants next attack plaintiff's use of 25.3 percent net profit rate for road construction and 21.9 percent net profit rate for blacktop production. They contend that plaintiff never reached those net profit levels, shows no comparable business that has attained those net profit levels, and that plaintiff cannot possibly show such a comparison because the figures are utterly without foundation. Plaintiff, of course, contends that the use of these projected percentages is reasonable and justified by the record.

Plaintiff contends that the 25.3 percent net profit on road construction is based upon actual performance of RSE in 1973, but cites nothing in the record to support that statement. Defendants argue that there is no way plaintiff could have achieved those net profit percentages and cites the net profit percentages of allegedly comparable enterprises.[11] Fortunately, resolution of this discrepancy is not required to resolve the matter presently before the court; therefore no definitive ruling is made on this issue.

■ With regard to plaintiff's claimed 21.9 percent net profit on blacktop production, however, the court finds this assump-

---

10. Mr. Wilcox also gave a comprehensive description as to how he arrived at the 25% demand figure. (Transcript Vol. 54, pp. 11,-261–264.)

11. Derived by defendants from exhibit P–78, as indicated in defendants' reply brief, p. 3.

| Company | Average Net Profit | |
|---|---|---|
| RSE | 22–26%** | (Blacktop, Road Construction) |
| Ciccone | 4.08%* | (Blacktop, Road Construction) |

| Company | Average Net Profit | |
|---|---|---|
| Hempt | 4.33%* | (Blacktop, Stone, Concrete, Road Construction, Farming) |
| Kimbob | 2.96%* | (Road Construction, Commercial Construction) |
| Pennsy | 1.18%* | (Blacktop, Stone, Concrete, Building Materials) |
| Pennsylvania Prestressed | 4.30%* | (Blacktop) |
| Union Quarries | 2.32%* | (Blacktop, Stone, Concrete) |

\* – actual
\*\* – projected

tion to be unsupported by the facts of record and to be so speculative as to render the last profit damage model, or any verdict awarded thereon, unreasonable. There are two reasons for this conclusion. First, this net profit percentage is based upon a net profit figure of $2.90 per ton, which can at best be termed inaccurate. This $2.90 per ton net profit was arrived at by taking a random sample of the sales to outsiders (i. e. not intracompany transfers), which plaintiff's own expert testified amounted to only 20% of blacktop production. Then the $2.90 was multiplied times the total output plaintiff claims it should have had for the respective years. The fallacy lies in the assumption that the profit on intracompany sales would be the same as profit on sales to outsiders. Plaintiff contends that the $2.90 figure was tested by two additional calculations but an in-depth analysis of those calculations shows they do not corroborate the assumption that intracompany sales price was the same as the sales price to outsiders. The fallaciousness of the assumption carries through to the results of the damage model, making it unsuitable for consideration by the jury.

The second reason for the court's finding that plaintiff's projected 21.9 percent net profit on blacktop production is not reasonable is that the basis for plaintiff's financial records itself was not reliable. Mr. Robert Rimmer, President of RSE, testified that the financial data obtained from its computerized statements was not reliable, that "it was one of those things where you have garbage in and garbage out." (Transcript Vol. 64, p. 14,035.) Yet these were the primary basis for the cost figures used by Mr. Wilcox in arriving at the $2.90 net profit figure. (Exhibits U–174, U–175.)

Defendants' final concerns with plaintiff's lost profit damage model are general in nature; that it encouraged the jury to speculate rather than arrive at a reasoned decision regarding damages and that it provides no raw data from which the jury could discern. In *Coleman, supra,* the court held that even with an expert's opinion as to the most pessimistic projection, the jury could not rationally reduce the figures to reflect only compensable losses. In this case, there was not even a reduction formula prepared by an expert, merely plaintiff's suggestion to the jury that "if you think the profit percentages are too high, cut them down." (Transcript Vol. 96, pp. 23, 201.) [12]

Plaintiff asserts that even if the last profit damage model is thrown out, there was sufficient raw data provided to the jury for it to arrive at a reasoned damage award. The court is unpersuaded by plaintiff's arguments. Its allegation that there is sufficient data from comparable firms is insulting to this court, in light of its many rulings that neither Ciccone or Wellsboro were comparable so as to use their financial data upon which to base a damage award. Nor is there even a hint of credibility to plaintiff's allegation that Robert Rimmer's proposal to sell to Pennsy is a reasonable basis upon which to base a damage award. The court, on March 13, 1981, specifically denied plaintiff's request to submit a new damage model based upon Prof. Kuhlman's exhibits because his exhibits simply were not prepared for that purpose and therefore did not provide the requisite raw data from which to prepare plaintiff's proposed studies without liberal use of guesswork. Guesswork based upon the studies of an expert cannot form the foundation of a damage award.[13] In short, plaintiff failed to provide sufficient evidence to the jury that would provide it with the raw data it would need to arrive at a damage

12. Plaintiff did provide the jury with alternative discount rates, which would affect the final amount of the award, but would *not* affect the finding of damages. This is so because only after it arrived at a damage figure, was the jury to select a proper discount rate. Hence, there was really no guidance for the jury to reduce the figures on a reasonable and rational basis.

13. In *IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 1019 (N.D.Cal. 1979), the court stated, "the fact that a witness has recognized other causation factors and decreased the damages by an arbitrary figure does not change the character of the result. Guesswork is guesswork whether it originates on the witness stand or in the jury room."

award without resorting to guesswork or speculation.

## Stone Overcharge Claims

 At the close of plaintiff's case, defendants filed for directed verdict and specifically referred to plaintiff's damages regarding stone overcharges. In its rebuttal testimony, plaintiff attempted unsuccessfully to establish some competent evidence to support an award of damages for that claim. In their motion for directed verdict at the close of all evidence, defendants did not specifically refer to damages from stone overcharges but referred instead to "lost profit damage study."

Plaintiff's interpretation of the case law of this circuit would require the court to deny defendants' motion for judgment n. o. v. with regard to stone overcharges, even though they were specifically mentioned in defendants' motion for directed verdict at the close of plaintiff's case; no testimony was admitted regarding them in plaintiff's rebuttal, although plaintiff made several different attempts; and defendants' specifically referred to them again in their motion for judgment n. o. v. Such an interpretation would require this court to close its eyes to the policy behind the rule, namely that a plaintiff should have notice of any defects in its case so that these may be alleviated and that the motion for judgment n. o. v. may not be used to trap the plaintiff if any defects in proof would preclude a case going to the jury. The "spirit of the rules [F.R.C.P.] [is] to avoid tactical victories at the expense of substantive interests." 5A Moore's Federal Practice § 50.08, at 2358–59 (1975).

Plaintiff cannot, in good faith, argue that it was not aware of defendants' objections to proof of damages from the stone overcharges (plaintiff attempted to cure this defect several times during its case in rebuttal), or that it suffered any kind of prejudice from defendants not specifically raising the issue in its motion for judgment n. o. v. at the close of all evidence. Since defendants did file a specific objection and plaintiff partook of its opportunity to correct the defect, the strict adherence to the rule as advanced by plaintiff would only serve to thwart the ends of justice, not protect them.

Defendants contend that no meaningful evidence was presented by plaintiff with regard to plaintiff's claim for stone overcharges. Plaintiff does not deny that it failed to have a study, exhibit, or expert opinion *admitted* regarding stone overcharges, but asserts that there are no less than five "unrebutted" evidentiary bases in the record which provide sufficient evidence upon which damages for stone overcharges could be determined. While the court does not deny that there was extensive testimony regarding discounts granted to parties other than plaintiff and a mammoth amount of documents filed that could be interpreted to substantiate that claim, there was no reasonable damage estimate submitted to the jury, nor was there evidence upon which the jury could have calculated, without speculation, the amount of damages suffered due to alleged stone overcharges. This aspect of plaintiff's case just never materialized, notwithstanding plaintiff's numerous but futile attempts to correct the omission.[14] Because of this failure to provide either a reasonable damage model or sufficient raw data from which damages due to alleged stone overcharges could be determined, defendants' motion for judgment n. o. v. on plaintiff's stone overcharge claim will be granted.

## State Law Claims

What remains of plaintiff's case against the defendants is its allegations of the state law claims of tortious interference with business relationship, over which this court exercised pendent jurisdiction. While the court is aware that dismissal of pendent state claims is permissible and in fact encouraged when the federal claims upon which they depend have been dismissed pri-

14. Plaintiff's attempt to show similarly situated customers who allegedly were given discount prices failed completely in that the discounts were given to customers who, by no stretch of the imagination, were comparable.

or to trial (*Broderick v. Associated Hospital Service of Philadelphia*, 536 F.2d 1 (3d Cir. 1976)), the court does not feel dismissal is proper in this instance. Accordingly, the court will maintain pendent jurisdiction over plaintiff's state law claims and decide defendants' motion for judgment n. o. v. with regard to these claims.

The following is the list of plaintiff's state law claims, transactions in which plaintiff alleges defendants tortiously interfered, that was submitted to the jury for its deliberations:

1. Plaintiff's attempt to lease or purchase the Fiddler's Elbow Quarry from D. M. Stoltzfus & Sons, Inc.
2. The understanding between plaintiff and General Crushed Corp. regarding the sale of stone to plaintiff.
3. Plaintiff's arrangement to dry sinter flux stone for Bethlehem Mines.
4. Plaintiff's requirement contracts to purchase stone from Bethlehem Mines, particularly IB's and screenings.
5. Plaintiff's proposed installation of a crusher on Bethlehem Mines property.
6. Plaintiff's claim that Emlet & Foust, Pavex, Inc., and others *would* have been willing to deal with plaintiff if not interfered with by defendants.

The jury found that there was no tortious interference with regard to number 5 above, which eliminates that claim from the present discussion. The jury, however, was hung with regard to all other claims. In its discussion, the court will refer to the claims as numbered above.

█ Defendants attack the first claim generally with regard to liability and to damages, and specifically allege that it is barred by the statute of limitations.[15] The court does not agree with defendants that the statute of limitation bars plaintiff from bringing the claim but finds no evidence of

record that could support a jury finding that any of the defendants who knew of the ongoing negotiations with D. M. Stoltzfus & Sons, Inc. acted willfully or unlawfully to interfere with any such negotiation. Indeed, plaintiff admits that the Grayson Road property, which it allegedly purchased because of this interference, was purchased prior to the dealings between Pennsy and D. M. Stoltzfus. There is not sufficient evidence of record to support plaintiff's contention that unlawful interference by any of the defendants *caused* the breakdown in negotiations with D. M. Stoltzfus and the subsequent purchase of the Grayson Road property. In fact, plaintiff's key witness on this claim, Mr. Walter Rimmer, testified on cross-examination that he had no knowledge of either direct or indirect intervention by any of the defendants with respect to these transactions or negotiations. (Transcript Vol. 48, p. 10,161.) Further, plaintiff's counsel admitted that he could not prove intervention but would let the jury infer that, depending upon the evidence. (Transcript Vol. 47, p. 9807.) A jury is not permitted to base its verdict on such suggestion and innuendo; reasonable inferences, yes, but no basis existed for such an inference in this case. Defendants' motion for judgment n. o. v. on that claim will be granted.

█ In claims two, three, four, and six, plaintiff has made the same fatal flaw as in the lost profit damage study, no evidence upon which a jury could *reasonably* base an award of damages. True, these are not antitrust claims, but plaintiff cannot seriously believe that a jury can award damages even where liability is proven, without some credible and reasonable evidence upon which to base such an award. In any event, plaintiff's counsel is fully aware that a court may not permit a verdict to stand where there is insufficient evidence to support same. Had the jury speculated as to

15. Defendants renew their arguments made in their motion for directed verdict at the close of all evidence by incorporating that motion and brief in the instant motion. Therefore, their arguments which include an attack on both

liability and damages, are the same. See defendants' memo in support of their motion for directed verdict on state law claims, which was filed on March 13, 1981, to document number 1032.

damages the court would have been compelled to render judgment n. o. v. The fact that the jury was hung does not alter the court's obligation.

In claim two, plaintiff asserts that as a result of defendant 441 purchasing the Newport Quarry from General Crushed Corporation and then increasing the price of stone, plaintiff lost all jobs for at least eight townships in which it had previously been successful in bidding. Even assuming, without deciding, that such an act constitutes behavior that could be classified as tortious interference, plaintiff's damage calculation, as explained to the jury during plaintiff's closing argument, is utterly preposterous.[16] Plaintiff assumes in its damage summary that it would have been successful in obtaining the motopaving work in 50% of the eight townships it *would* have bid in, that it would have averaged $30,-000.00 on each job and that the gross profit on each job would have been 26.7%. There are not facts in *evidence* that support these assumptions or this model. Even more there are no facts of record from which the jury could reasonably have arrived at a damage award. Accordingly, defendants' motion for judgment n. o. v. will be granted.

Claim three refers to a contract between Bethlehem Mines Corporation and plaintiff, which was allegedly interfered with by Robert Mumma, President of Pennsy Supply Co. The lack of credible evidence regarding damages is particularly true in this claim in light of the testimony of Mr. Robert Rimmer, indicating that the drying of sinter flux for Bethlehem was only marginally profitable, but giving no figures. (Transcript Vol. 61, pp. 13, 114.) In his closing argument, which is not evidence, plaintiff's counsel indicated, *inter alia*, that there was evidence that plaintiff made 15% net profit on the sinter flux drying. A search of nearly the entire transcript, which was required because plaintiff failed to designate either who so testified or at what

volume or page of the transcript this testimony occurred, did not reveal any such testimony. Mr. Robert Rimmer's testimony that the process was marginally profitable coupled with document R–342 could not constitute the basis for a damage award by the jury. Plaintiff fails to point to any evidence in the transcript that would support an award.

Claim four, dealing with plaintiff's requirements to purchase stone from Bethlehem, particularly 1B's and screening suffers from the same defect. In his closing argument, plaintiff's counsel openly admitted that damages could not be determined on a reasonable basis but could only be determined by sheer guesswork. The following comments by plaintiff's counsel are illustrative:

> Now, in addition to that, we had a requirements contract from Bethlehem that they were supposed to give us all our requirements of screenings and 1B's. *Who knows what that cost us?* (Transcript Vol. 96, pp. 23, 194.) (Emphasis added.)

Plaintiff's counsel could not recall any evidence regarding amount of damage and this court, after exhaustive search through the transcript, could find none. No jury could have made a justifiable award of damages on this claim.

Plaintiff's final claim, number six, refers to the revenues it allegedly lost as a result of defendants' alleged interference with customers such as Emlet & Foust, Pavex, Inc., and others who *would* have dealt with plaintiff had it not been for the unlawful interference of the defendants. Again, even assuming there were unlawful acts committed by the defendants which resulted in plaintiff's loss of business, there was not even an estimate as to the amount of business plaintiff lost as a result. What damages could a jury have awarded? Plaintiff did not show the revenues it earned from such activities in prior years and was prevented from earning after de-

---

**16.** Plaintiff never presented this damage model or summary prior to the closing or submitted it for evidence. Had a model such as that used

by plaintiff's counsel in closing been offered, it would not have been admitted.

fendants' alleged intervention. True, there may have been figures hidden in the musty creases of the mountain of documents plaintiff admitted, but they were never admitted for that purpose nor has plaintiff taken the opportunity to call them to the court's attention. In the court's opinion, there was no evidence upon which to base a reasonable damage estimate in this claim.

In summary, the court will grant defendants' motion for judgment n. o. v. with regard to all of plaintiff's state law claims for the reasons set forth above. Whether out of neglect or design, plaintiff failed to come forward with sufficient reliable evidence upon which a jury could formulate damages on its state law claims two, three, four and six.

*Plaintiff's Motion for New Trial*

 ▮ As an alternative to its motion for judgment n. o. v., plaintiff requested a new trial. The court is of the opinion that plaintiff had more than ample opportunity to present a valid damage model or evidence to support a reasoned damage award and either failed or refused to do so, not once, but on *six* separate occasions. The history of plaintiff's attempts to introduce these exaggerated damage models is best described in a segment of defendants' memorandum in support of its motion for judgment n. o. v. as follows:

> From the start of the trial, plaintiff was permitted to go up and back "to the drawing board," preparing and revising damage studies. The original massive Bisbano Report was turned over on June 2, 1980, the first day of trial (Vol. 42A, Tr. 8300–01). But, just before Bisbano was to testify—and after defendants had put in substantial preparation time— plaintiff indicated that slight changes were required and was granted until September 29 to file a revised study (Order of 9/25/80; Vol. 38, Tr. 7121–22). Trial did not resume until October 20, by which time a wholly different "Wilcox Report" had been tendered based on Ciccone data (Vol. 42A, Tr. 8300–01). When voir dire immediately revealed major errors (Vol. 43, Tr. 8624–28, 8630–31, 8642–43), plain-

tiff was permitted (over objection) to submit still another Wilcox report with over $2 million of revisions (Vol. 44, Tr. 8903–04, 8911–12).

> On October 29, 1980, after briefing and argument on the issue of comparability, the Ciccone model was stricken for periods after 1976. But, again, leave to revise was permitted and a new post-1976 study was produced. By order of November 7, 1980, the revision was rejected, but leave to modify was permitted again and a new study was submitted. However, by order of November 10, 1980, the Court excluded the Ciccone comparison *altogether* on the ground that a gross profit analysis was inappropriate: "... *the proposed damage model arrives at figures that are far from reasonable and bound on the absurd.*" (Memorandum Opinion of 10/12/80; emphasis supplied).

> Nonetheless, the Court again granted leave to revise. On November 12, plaintiff filed no less than seven different damage studies,—including the three beachhead schedules now before the Court (References 1, 5, and 6), a Wellsboro model, a new Ciccone model, a Motopaver model and a future profits projection based on all the models. By order of November 14, the Court excluded all but the three beachhead "References." (Defendants' memorandum filed May 26, 1981, pp. 28–29.) (footnote omitted.)

It becomes clear to the court that either plaintiff could not compile a reasonable damage model or introduce evidence to support a reasonable damage award, or plaintiff did not choose to do so, opting instead to place an enormous damage figure and one that could not be supported by the evidence in front of the jury and let them "cut it down." If the former was true, plaintiff was given every possible opportunity to correct the defects. If the latter was true, plaintiff seriously abused the good graces of this court and the judicial process and should not be given a chance to correct his errors. In any event, a subsequent trial would not give plaintiff an op-

portunity it has not already had several times over. The court is of the opinion that the ends of justice would not be served by imposing a new trial on the court, a jury, defendants, and plaintiff, where the only purpose of such action would be to give plaintiff still another chance to present reasonable damage evidence, after six such chances have failed. Plaintiff's motion for new trial will be denied.