**JOSEPH CICCONE & SONS, INC.**

v.

**EASTERN INDUSTRIES, INC., Stabler
Companies, Inc., Donald B. Stabler,
and Stabler Construction Company.**

Civ. A. No. 81–3203.

United States District Court,
E.D. Pennsylvania.

Feb. 24, 1983.

Louis R. Koerner, Jr., New Orleans, La., for plaintiff.

Frank A. Sinon, R. Stephen Shibla, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

This is a private antitrust case brought under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

The plaintiff, Joseph Ciccone & Sons, Inc. (Ciccone) is a vertically integrated road paving contractor and blacktop producer with its principal place of business in Bath, Northampton County, Pennsylvania. Ciccone is a producer of blacktop and a consumer of aggregate.[1]

The corporate defendants in this case are various related companies all controlled by the individual defendant, Donald B. Stabler. Eastern Industries, Inc. (Eastern), one of Stabler's entities, is the principal corporate defendant and the main target of plaintiff's allegations. Eastern is headquartered in Wescosville, Lehigh County, Pennsylvania, and it is principally a vertically integrated producer of blacktop and aggregate, as well as a road paving contractor. Eastern is a direct competitor of Ciccone in its blacktop and road paving businesses and it is also a supplier of aggregate to Ciccone.

Eastern operates aggregate producing quarries in a four-county area at Oley and Kutztown (Berks County), Ormrod and Whitehall (Lehigh County), Nazareth (Northampton County) and Kunkletown (Monroe County). Eastern operates blacktop plants at Kutztown and Douglasville (Berks County), Ormrod and Wescosville (Lehigh County) and Bethlehem (Northampton County).

Stabler Companies, Inc. is a holding company with no independent operations. Stabler Construction Company is a subsidiary of Stabler Companies, Inc. Stabler Construction has no permanent business location or significant activity in the area in which Eastern and the plaintiff operate.

Plaintiff filed its complaint on August 7, 1981, together with a motion for temporary restraining order and motion for preliminary injunction. A four-day hearing on plaintiff's motion for temporary restraining order was held on September 30, and Octo-

---

1. The term "aggregate" is used to refer generally to crushed stone, sand, and gravel which is used in road construction and repair and in the manufacture of blacktop. "Blacktop", or as-phaltic concrete, is produced by combining sand and either crushed stone or gravel with a liquid petroleum component, the mixture being heated at high temperatures.

ber 1, 2, and 5, 1981. At the conclusion of the temporary restraining order hearing, plaintiff withdrew its motion for temporary restraining and its motion for preliminary injunction. Thereafter, the parties proceeded through discovery and the case was tried to the Court, sitting without a jury, over eight trial days from April 7 to April 19, 1982.

The substance of plaintiff's claim is that defendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18, by making certain acquisitions which either have or will tend to substantially lessen competition in the aggregate and blacktop markets. As noted before, plaintiff also alleges certain violations of the Sherman Act which shall be considered, *infra.*

Section 7 of the Clayton Act prohibits a corporation from acquiring the stock or assets of another corporation where the effect of such an acquisition may be substantially to lessen competition in any line of commerce in any section of the country.[2] 15 U.S.C. § 18. Thus, the section declares unlawful only those acquisitions which have a specified adverse effect on competition. The law requires a showing of a tendency to substantially lessen competition or to create a monopoly in any section of the country. 15 U.S.C. § 18.

In the present case, Ciccone challenges three "acquisitions" made by Eastern between 1977 and 1981.[3] The first acquisition was the purchase of the "Trumbower" quarry in Nazareth, Pennsylvania, in 1977.[4] The second challenged "acquisition" was the 1980 signing of a "Lease Royalty Agreement" between Eastern and Coplay Cement.[5] Finally, Ciccone challenges the 1981 purchase by Eastern of the "Bethlehem Blacktop Plant" located in the City of Bethlehem, Pennsylvania. This purchase was made after the acceptance by Bethlehem Steel Corp. of sealed competitive bids. Eastern was the high bidder and Ciccone was the second highest bidder.[6]

Although there are numerous issues and affirmative defenses raised by the parties, the primary and controlling issue in this case is whether the plaintiff has carried its burden of proof in establishing that the challenged acquisitions have or will tend to have a substantial adverse effect on competition in "any section of the country". For the reasons stated hereinafter, we conclude that it has not.

As noted above, the Clayton Act does not condemn all corporate mergers and acquisitions, but only those, the effect of which "may be substantially to lessen competition

2. "[N]o corporation engaged in commerce shall acquire, directly or indirectly, . . . the assets of another corporation engaged also in commerce, where in any line of commerce, in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

3. Plaintiff also originally challenged the purchase of a used blacktop plant from a secured creditor of a defunct firm located in Harrisburg, Pennsylvania. We previously granted summary judgment in favor of defendants on this issue. *See, Joseph Ciccone & Sons, Inc. v. Eastern Industries, Inc.,* 537 F.Supp. 630 (E.D. Pa.1982).

4. In this regard it is interesting to note that the "Trumbower" quarry was not even producing stone at the time of the purchase and for several years prior to that time had been unable to supply even the small BilRich company which was located adjacent to the quarry. Ciccone found the quarry to be in such poor condition, that it did not even wish to bid on it. It is only after Eastern brought the quarry back into pro-

duction and was able to supply Ciccone's competitor with stone, that Ciccone brought this action.

5. The Coplay Cement quarry is physically adjacent to the Eastern Nazareth (formerly Trumbower) quarry in Nazareth, Pennsylvania. Coplay uses a high calcium limestone in its cement making operations. The low calcium dolomite which is used as roadstone lies in separate strata within the formations and is not suitable for cement making operations. Ciccone had also examined the Coplay quarry. Although Ciccone claims to be seriously concerned about a "secure" source of aggregate supply and argues that it has been "foreclosed" from the Coplay stone, the testimony was clear that prior to Eastern's involvement with Coplay, plaintiff was twice requested to submit a proposal to Coplay but declined to do so,

6. Ciccone testified, however, that it would be relatively easy for anyone to set up a blacktop plant in the vicinity of the Bethlehem plant.

or to tend to create a monopoly". 15 U.S.C. § 18. In adopting Section 7, Congress did not adopt any particular test for measuring the probable effect of an acquisition; rather it indicated that the acquisition should be considered in the context of the particular industry involved. *United States v. Brown Shoe Co.,* 370 U.S. 294, 321, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). What may be accurate or appropriate in the banking industry, for instance, may be totally different in the context of the aggregate and blacktop business.

As the Court noted in *United States v. Philadelphia National Bank,* 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963);

[T]he ultimate question under § 7 [is] whether the effect of the merger "may be substantially to lessen competition" in the relevant market. Clearly this is not the kind of question which is susceptible of a ready and precise answer in most cases.

Any evaluation of probable competitive effect can only be made within the context of a relevant market. The delineation of the relevant geographic market is frequently the key issue. In *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 329, 81 S.Ct. 623, 629, 5 L.Ed.2d 580 (1961), the Supreme Court stated that "the relevant market is the prime factor in relation to which the ultimate question ... must be decided". *Id.*

Both the Clayton Act and Sherman Act require a showing of anticompetitive effect on a line of commerce within an "appropriate section of the country". *United States v. Brown Shoe Co.,* 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962).

Determination of the relevant market is a necessary predicate to a finding of violation of the Clayton Act because the [challenged merger] must be one which will substantially lessen competition "within the area of effective competition". Substantiality can be determined only in terms of the market affected.

*Id.* at 324, 82 S.Ct. at 1523. "Unless we know where to look, in other words, we cannot know what effect the merger will have or how substantial that effect will be". *United States v. M.P.M., Inc.,* 397 F.Supp. 78, 86 (D.Colo.1975) quoting Kintner, *Primer on the Law of Mergers* at 221 (1973).

The plaintiff bears the burden of proof in demonstrating the existence and scope of a relevant geographic market. *See, e.g., United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). However, although plaintiff is required to show the relevant geographic market by *competent economic evidence, e.g., United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D.Pa.1981), no formalistic approach is required. *United States v. Brown Shoe Co.,* 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962). Only a "pragmatic, factual approach" is required, *id.,* not a "scientifically precise definition" *United States v. M.P.M., Inc.,* 397 F.Supp. 78, 88 (D.Colo.1975) or a "metes and bounds" description. *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966).

Plaintiff contends that the appropriate relevant geographic market for the sale of aggregate and blacktop is an area which it describes as the "Lehigh Valley". Included in this proffered market is all of Lehigh and Northampton Counties except specified portions in the northeast section of Northampton County. The area so described would consist of a market of approximately five (5) firms producing aggregate and seven (7) firms producing blacktop.

In support of its contention that the "Lehigh Valley" is the relevant geographic market in this case, plaintiff relied to a considerable extent upon the testimony of its expert witness, William Lovett, a professor of law and economics at Tulane University School of Law. Certain demographic and geographic evidence was also offered together with the testimony of a geologist. In addition, evidence of production and sales of various competing firms was presented together with oral testimony of numerous competitors.

Countering, defendants assert that the relevant geographic market includes a considerably larger number of competitors than that posited by plaintiff. It is defendants' contention that the relevant market consists of all aggregate and blacktop producers located within an area of twenty-five to thirty-five miles of the facilities of defendant, Eastern Industries. Defendants presented detailed sales and production figures and testimony of actual and potential competitions. In addition, the defendants' expert economist, Mr. William Lynk, presented his economic analysis in support of the twenty-five to thirty-five mile market.

We have reviewed the record in this case, including the Requests for Findings of Fact, Conclusions of Law and Post Trial briefs submitted by the parties, the detailed statistical evidence and exhibits, the testimony of both expert economists and the testimony and depositions of the competitors.

The Court finds that plaintiff's contention concerning the "Lehigh Valley" as the appropriate market is not supported by the credible evidence. Specifically, the testimony of Mr. Lovett was lacking in adequate foundation and is, therefore, rejected by the Court.

Initially, plaintiff and its expert knowingly based their market contentions upon a narrow set of data. Although Mr. Lovett repeatedly referred to his "work papers" which he had left in New Orleans, he eventually admitted under cross-examination that he relied only upon Exhibits P–30 and P–31.[7]

The testimony and exhibits, however, clearly show that there exist as many as forty to fifty competing and potentially competing blacktop and aggregate firms which were not considered by plaintiff's expert. See, e.g., Exhibits D–1, D–7, P–72(b), 72(c), 73(b), 73(c), P–74, 75, 75(a), and 75(b). This fact severely undercuts plaintiff's position. Mr. Lovett also acknowledged that particular shipping distances would be a relevant factor to consider, but he failed to consider information in this regard.[8] Mr. Lovett made no analysis whatsoever of the patterns of shipments of any firm, although he acknowledged this to be important.[9]

Mr. Lovett further stated that "excess production capacity is one of the relevant structural factors within a market ..."[10] but acknowledged, however, that the data he reviewed was "not designed to describe production capacity".[11] Later testimony revealed excess production capacity to be considerable.

Plaintiff's expert also noted that in defining a relevant geographic market it is important to determine which firms can have

**7.** "Q. So, you didn't make those determinations of what was relevant and what was not?
A. Correct.
Q. So the only information that you have relied upon is P–30 and 31?
A. And the procedure that presumably underlies those documents.
Q. That procedure being that [plaintiff's attorney and an employee of plaintiff] would make a determination of the relevance of the information which would be presented to you?
A. And that they would have reasonable shipments data or testimony or something to go on." (N/T 459)

**8.** "Q. Would information concerning particular shipping distances have an impact upon your opinion and the propriety of defining the relevant geographic market?
A. Correct.
Q. ... what did you look at? What information was provided to you upon which you

have based your opinion relating to shipping distances?
A. The tabulations reflect the assumption and the consideration of the relevant distance factor ...
Q. Okay, fine. We are back to [plaintiff's counsel and an employee of plaintiff]?
A. Correct." (N/T 461–62)

**9.** "It's a question of where and to what degree there is a significant penetration.... You want to know all the information: distance, quantity and where." (N/T 476).

**10.** See, N.T. 470.

**11.** See, N.T. 471, 474. Lovett's failure to consider excess production capacity is somewhat mystifying in light of our prior discussion of its importance. *Joseph Ciccone & Sons, Inc. v. Eastern Industries, Inc.*, 537 F.Supp. at 630.

a significant effect on competitive pricing. He totally failed to consider, however, the impact of these firms. Although he acknowledged that shipments outside of a particular area could have competitive significance on the pricing structure inside the market, he admittedly did not consider any such information. Admittedly, he totally failed to consider a firm, Alpha Aggregates, which plaintiff's counsel stated had "substantial market shares".[12]

In addition, plaintiff's expert opined that a zone of twenty-five to forty miles would constitute a reasonable geographic market in this case. However, his opinion that Lehigh and Northampton Counties are the appropriate market bears little or no relation to the above testimony. Mr. Lovett admitted that he had defined the market solely in terms of the plaintiff and not in terms of Eastern, whose market would be wider and broader or in terms of both the acquired and acquiring firms.

In expressing his opinions, Lovett assumed that one competitor, Keystone, was in a difficult or vulnerable financial situation. He acknowledged that if this assumption were incorrect, it would have an impact upon his ultimate conclusion in the case. The Court finds that the assumption was incorrect.

Lovett assumed that entry barriers were high but failed to consider the impact of existing cement quarries or the availability of portable blacktop plants. He admitted that if it were possible and feasible to open new quarries that fact could have a significant impact upon his opinion. However, plaintiff's own expert geologist testified that it was both possible and feasible to open a new quarry. Lovett also used a "land use" map to determine the quantity of land zoned for quarries. A zoning map is obviously different than a map showing actual land use. Lovett acknowledged that if there were any significant differences between the land use map and actual zoning it could alter his testimony. The evidence shows that in some areas there were differences.

The evidence also showed that the sales and production information used by Mr. Lovett was inaccurate as well as incomplete. For instance, for one firm[13] Lovett used sales figures of 76,000 tons of aggregate for 1979 and 1980. The actual production figures were 340,000 and 379,000 tons, with 270,000 tons sold within twenty-five miles of Eastern's facilities. For another firm, Lovett used a figure of 20,000 tons, whereas the actual production was 112,000 and 155,000 tons with sales of 100,000 and 145,000 tons within twenty-five miles of Eastern. These differences amount to up to a 498% error for the first company and a 775% error for the second.

When all of the above factors and deficiencies are considered, the Court finds that the Lovett testimony and plaintiff's offered proof contain errors of such proportions as to require that it be rejected. *Kennecott Copper Corp. v. Curtis-Wright Corp.,* 584 F.2d 1195 (2d Cir.1978); *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D. Pa.1981). Without such proof, any inference of market power amounts to "sheer speculation". *Forro Precision, Inc. v. International Business Machine,* 673 F.2d 1045, 1059 (9th Cir.1982).

The Court, therefore, finds that plaintiff failed to sustain its burden of proving a relevant geographic market. *See, Borough of Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 311 (3d Cir.1982) (Definition of a geographic market is a question of fact); *Martin B. Glauser Doyd Co. v. Chrysler Corp.,* 570 F.2d 72, 82 n. 18 (3d Cir.1977) (The determination of a relevant geographic market is a factual one); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1241 (8th Cir.1973) (same holding). Without a market context, it is obvious that plaintiff has not demonstrated that

---

**12.** *See* Memorandum in Support of Temporary Restraining Order, p. 13.

**13.** The various competitors produced sales information under a confidentiality order and, therefore, the names will not be used in this opinion. The firms and the figures are identified on Exhibits P–30, P–31, P–75a and P–75b.

Eastern has obtained or exercised monopoly power or that the acquisitions in question may tend to substantially lessen competition. *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *United States v. E.I. DuPont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957); K. Elizinga & T. Hogarty, *The Problem of Geographic Market Delineation in Antimerger Suits,* 18 Antitrust Bull. 45, 80 (1973).

Plaintiff contends, however, that even if the Lovett testimony is not accepted by the Court and the "Lehigh Valley" is not accepted as the relevant market, there is sufficient statistical evidence in the record from which the Court can determine the existence and scope of the relevant market and calculate market shares. The Court has considered this argument in detail.

On the basis of the record before us[14], the Court has little difficulty in concluding that the acquisitions under question have not and will not tend to have any adverse effect on competition such as is proscribed by the antitrust laws. Although we are not prepared to adopt all of the economic contentions or theory espoused by the defendants, it is clear from the record that there is substantial and vigorous competition between a great number of firms, including both plaintiff and defendants.

It is plaintiff's burden to present evidence from which market shares can be calculated with some reasonable accuracy. It has failed to do so in this case. Whether the twenty-five to thirty-five mile radius is calculated from Eastern's facilities or the situs of the acquisitions, it is clear that the area encompasses a substantial number of competing firms and that the sales production and capacity so represented have a substantial competitive impact on prices.

Plaintiff's own expert acknowleged the importance of considering excess capacity and the competitive significance of firms on the so-called fringe area. The Court finds that these firms do exert a significant competitive effect on prices.

It is also interesting to note that since the challenged acquisitions, Ciccone has prospered and competed in an extremely effective manner. Joseph Ciccone acknowledged that 1981 was plaintiff's "best year in history".

In summary, it is the conclusion and finding of this Court that the acquisitions in question have not been shown to be violative of the antitrust laws; and, to the contrary, the evidence presented leads the Court to conclude that they will not result in a lessening of competition or any impermissible increase in concentration.

■ Plaintiff has also raised several claims under Sections 1 and 2 of the Sherman Act. These claims have been fully considered by the Court. We find that plaintiff failed to establish the existence of any unlawful agreement, conspiracy or concerted action on the part of any of the defendants. We find no credible evidence of any intent to monopolize or to injure competition. *See, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). We have noted above that plaintiff failed to establish the existence of any market power or the existence of any power to control prices or exclude competition. *E.g., Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.,* 579 F.2d 20 (3d Cir.1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979). Plaintiff's own witness

---

**14.** The record in this case contains estimates of sales or production figures of some fifty-seven (57) competing quarries and some forty-five (45) competing blacktop plants. (Exhibit P–74, Tables 1 and 2). The record also contains the total shipments of competing firms located within thirty-five (35) miles of any Eastern facility as well as the estimated shipments made to locations within twenty-five miles of Eastern facilities. (Exhibits D–9 through D–12). Defendants also produced accurate estimates of the available capacity of these competing firms. (Exhibits D–9 through D–12 and P–74 and 75). Finally, there is considerable evidence that a shipping distance of twenty-five to thirty-five miles is reasonable and realistic. (Both experts, as well as various other witnesses, agreed with this estimate.)

established the existence of price competition and the evidence of prices paid by Ciccone demonstrates the existence of substantial price competition. Moreover, 1981 was a year of great bidding success for plaintiff and in a contracting market, such success is evidence of a lack of market power of Eastern. We note that much of Ciccone's increased success came at the expense of Eastern. We, therefore, have no difficulty concluding that the acquisitions are not combinations violative of Section 1.

■ A Section 2 claim for attempted monopolization requires a showing of a specific intent to monopolize and sufficient market power to come dangerously close to success. *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068 (3d Cir.1978). *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D.Pa.1981), *Wire Mesh Products, Inc. v. Wire Belting Ass'n,* 520 F.Supp. 1004, 1008 (E.D.Pa.1981). The Court finds no such proof in this case.

■ Finally, plaintiff contended that the defendants engaged in discriminatory pricing or predatory pricing in violation of Section 1. The evidence revealed that many prices in the aggregate and blacktop industries are negotiated prices. Discounts are negotiated both for large volume customers and for particular jobs. Plaintiff's representatives testified that plaintiff had always received such discounts from Eastern as well as other companies. In addition, plaintiff made no attempt to demonstrate defendants' costs. Without costs, prices are meaningless and cannot be found to be predatory. *See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir.1980); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Moreover, plaintiff's own expert agreed that in a contracting market with production and sales decreasing that it is difficult to distinguish anticompetitive pricing from natural competition and acknowledged that he had not been provided with the type of information

necessary to make such a distinction. We conclude that plaintiff failed to establish any violation of Section 1.

Because we conclude that all of plaintiff's claims have failed, we need not consider the various separate affirmative defenses raised by defendants.

Defendants have filed a counterclaim[15] in which they assert that the plaintiff's action was initiated and continued in a bad faith and vexatious manner and as a result of which, they should be entitled to attorney's fees and compensation for executive time. In support of their contention, defendants cite Fed.R.Civ.P. 11 and *LeGare v. University of Pa. Medical School,* 488 F.Supp. 1250 (E.D.Pa.1980); the provisions of 28 U.S.C. § 1927, and the Court's inherent equitable powers. *See Nemeroff v. Abelson,* 94 F.R.D. 136 (S.D.N.Y.1982).

As a basis for their contentions, defendants assert that Joseph Ciccone "threatened" to bring this action unless Eastern agreed to purchase the Ciccone business at a high price. Defendants also argue that plaintiff was unable to point to any facts establishing a Sherman 1 and 2 claim and that Joseph Ciccone testified that he knew of no such facts, that he did not understand portions of the complaint and that some allegations in the complaint were false. Ciccone also acknowledged that his own trial testimony was written in question and answer form by his attorney, a fact verified by another witness who assisted in the preparation. In addition, defendants argue that the fact that plaintiff's motion for a temporary restraining order, which resulted in four days of testimony, was withdrawn at the conclusion of the testimony, is indicative of vexatious or oppressive conduct on the part of plaintiff. Finally, defendants urge that no serious effort was made to establish a relevant geographic market because plaintiff's expert was given inaccurate and erroneous data in an effort to have him express a favorable opinion.

---

**15.** Leave to file a counterclaim was granted after our decision in a related case. *See, East-* *ern Industries, Inc. v. Joseph Ciccone & Sons, Inc.,* 532 F.Supp. 726 (E.D.Pa.1982).

Should the course of further litigation in this matter dictate our reconsideration of the issue, there is little doubt that we shall in good conscience, and in the exercise of sound discretion, *Copperweld Steel Co. v. Demag-Mannesmann-Bohler,* 624 F.2d 7, 9 (3d Cir.1980), be obliged to more seriously and perhaps favorably consider the defendants' contentions as regards certain major items of expense which presently exceed $482,000.00. *See,* Fed.R.Civ.P. 54(d).

An award of some of the costs of suit is frequently made after a successful defense to an antitrust suit. *State of Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 864–68 (7th Cir.1981); *Admiral Theater Corp. v. Douglas Theater Corp.,* 585 F.2d 877, 899 (8th Cir.1978).

Although we sympathize with any litigant who is forced, at considerable expense, to successfully defend against costly litigation, we make no finding at this time as to questions of vexatious conduct and bad faith. Absent an affirmative finding, at this time, that the plaintiffs conducted this litigation in a vexatious or in bad faith manner, we are obliged to deny the defendants' counterclaim.

The foregoing, with the exception of the immediately preceding paragraph, shall constitute our findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

An appropriate order shall issue.

## ORDER

AND NOW, this 24th day of February, 1983, IT IS ORDERED that judgment is entered in favor of defendant and against plaintiff on the complaint.

IT IS FURTHER ORDERED that judgment is entered in favor of plaintiff and against defendant on the counter-claim and that each side shall bear their own costs.