**AMERICAN KEY CORPORATION, and Ron DeWeese, Plaintiffs-Appellants,**

v.

**COLE NATIONAL CORPORATION, and Sears, Roebuck and Co., Defendants-Appellees.**

**No. 84–8058.**

United States Court of Appeals, Eleventh Circuit.

June 12, 1985.

John C. Butters, Atlanta, Ga., for plaintiffs-appellants.

Emmet J. Bondurant, Thomas B. Metzloff, Atlanta, Ga., Paul Michael Pohl, Cleveland, Ohio, for Cole Nat. Corp.

Michael A. Doyle, Frank G. Smith, Atlanta, Ga., for Sears.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

ATKINS, District Judge:

■ Appellant, American Key Corporation [1] (American Key) seeks reversal (a) of

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Ron DeWeese was added as a plaintiff in the amended complaint. The district court properly ruled that DeWeese, as President and major stockholder of American Key, did not have standing under Section 4 of the Clayton Act. In its brief, in this appeal, American Key does not dispute this holding. *See Martens v. Barrett,* 245 F.2d 844 (5th Cir.1957). *Mendenhall v. Fleming Co., Inc.,* 504 F.2d 879, 881 (5th Cir.

summary judgments entered in behalf of the appellees, Cole National Corporation (Cole) and Sears, Roebuck & Co. (Sears) and (b) orders restricting discovery.

American Key filed an anti-trust action alleging a conspiracy to violate sections 1 and 2 of the Sherman Act. The original complaint was filed in May 1980 against Cumberland Associates and Carter & Associates, Inc., the owners of the mall in which American Key was located. Carter filed its answer June 5, 1980 and Cumberland filed its answer on February 13, 1981. A district court local rule requires that discovery be completed within four months, unless extended within that time, after the filing of an answer. In March, 1981, leave was granted to file an amended complaint naming Cole and Sears as defendants on the theory that they had conspired to keep American Key, an alleged rival, out of various malls. Cole and Sears filed their answers respectively on May 1 and 5, 1981. On October 29, 1982, after several extensions had been granted, the district court extended the discovery period an additional 30 days for a limited purpose.

All defendants moved for summary judgment urging that facts developed in discovery established there was no evidence to support the claims of the amended complaint. In granting the motions, the district court, 579 F.Supp. 1245, concluded: (a) the relevant product market was "replacement keys and related items"; (b) the relevant geographic market was not, as American Key claimed, only regional enclosed shopping malls; (c) that American Key had not offered significant probative evidence which would tend to show the conspiracy it had alleged; and (d) there was no evidence that any of the appellees had monopoly power in any relevant market nor that they had attempted or conspired to monopolize the sale of replacement keys and related products.[2]

Finding no abuse of discretion in the discovery rulings and no error in the determination that there was no genuine issue as to any material fact, we affirm.

## STANDARD OF REVIEW

The district court's order granting the summary judgments is reviewable by this Court to determine if American Key produced sufficient material facts to raise genuine issues for trial. *See, First National Bank v. Cities Service Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 553 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).

■ The district court's discovery orders are reviewable by this Court only for an abuse of discretion. *Wyatt v. Kaplan,* 686 F.2d 276 (5th Cir.1982); *Scroggins v. Air Cargo, Inc.,* 534 F.2d 1124, 1133 (5th Cir. 1976).

## STATEMENT OF THE FACTS

The facts in this appeal are undisputed. Cole is a corporation with headquarters near Cleveland, Ohio, involved in a variety of retailing enterprises. Besides its key duplicating services described below, Cole sells (1) personalized products through its "Things Remembered" stores; (2) video games, home computers, toys, juvenile furniture, sporting goods, and outdoor play equipment through its "Child World" and "Children's Palace" stores; (3) cookies through its "The Original Cookie Company" stores; and (4) prescription eyewear and related optical products.

A relatively small aspect of Cole's business is its key duplicating services, accounting for less than 6% of its sales in 1981. As of January 31, 1982, Cole operated numerous key duplicating shops on the premises of major retailers. Many, but not all, of these shops are located in stores that are found in malls or shopping centers.

1974). The only appellant before this Court is American Key.

**2.** American Key in its brief states that it has settled with defendants Carter & Associates and Cumberland Associates, against whom the original complaint was filed. Accordingly, those two defendants are not parties to this appeal.

Cole markets its key duplicating services by operating key shops primarily at small locations leased from major retailers. These locations are either in the store of a major retailer, or else directly adjoining the retailer such as in the store's parking lot. In some of its key shops, Cole sells other items and provides other services in addition to the key duplicating service.

## THE COLE AND SEARS RELATIONSHIP

Since the 1930's, Cole and its predecessor have contracted with Sears to lease space to operate key shops in or adjacent to certain Sears stores. Under the terms of licensing agreements between the parties, Cole pays Sears a percentage of its net sales from the key shop in Sears stores. The parties presently operate under two non-exclusive concession agreements relating to the key shops; the first concerns "Outside Key Shops" which are located in Sears' parking lots, while the second concerns "Inside Key Shops" located within particular Sears stores. Under both Agreements, Sears grants Cole "the privilege of conducting and operating" the key shops at particular Sears stores designated in a "Location Rider" attached to each Agreement. The Agreements set Sears' compensation at 22% of Cole's net sales for each shop.

The Agreements afforded Cole total control over employee relations, including the "sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge said employees." All contracts and purchases made by Cole in connection with the key shops are to be made directly by Cole in its own name. The Agreements give both parties the right to terminate the licensing arrangement upon sixty days' notice with or without cause. The Agreements expressly provide that upon termination, Cole has no right or interest relating to any future contracts that Sears may elect to make with others regarding the key duplicating concession. The Agreements expressly state that Sears may elect to (1) operate the key shop itself; (2) have any third party operate it; (3) enter into a new arrangement with Cole; or (4) terminate the key shop operation altogether.

The Agreements do not contain an "exclusive" dealing provision. Sears has the right to operate key shops itself or to have others do so, or not to have a key shop at all. Sears has leased key departments that are operated by companies other than Cole. The latter is not obligated to serve all Sears stores, and, in fact, does not. Cole is not foreclosed from dealing with other retailers to operate key duplicating facilities in other stores or to open key shops of its own—a right which Cole exercises. The Agreements do not contain any provisions giving Sears control over Cole's pricing. The Agreements expressly state that Sears has no "right or power to effect or control the prices at which service and/or merchandise shall be offered" by Cole.

## COLE AND ITS "THINGS REMEMBERED" CHAIN

In the early 1970's, Cole began developing a new retail marketing concept in which it would lease space in a mall or shopping center to establish a store which would sell a wide variety of products that could be engraved or "personalized" while the customer waited. A "Things Remembered" store carries such items as mugs, pen and pencil sets, ID bracelets, baby gifts, inexpensive jewelry, door knockers, and lighters.

As an additional product line, some "Things Remembered" stores include a small-scale key duplicating facility. The key duplicating facility is not a significant aspect of the product mix or marketing concept of the "Things Remembered" stores. Key facilities are included because of the low costs of including the key duplicating capability.

In certain instances, Cole has placed a "Things Remembered" store in a mall which already has an existing Cole operated key shop in a Sears store, or Cole has opened a key shop in a Sears store in a mall in which a "Things Remembered" store was already operating. In 1973, Cole at the request of Sears, entered into an agree-

ment with Sears in which Cole agreed to adjust its payments pursuant to the license agreements (which were previously based on a percentage of sales of Cole key shops) in order to compensate Sears for any reductions that might be caused by the operation of a "Things Remembered" and a Sears key shop in the same mall.

### DeWEESE AND HIS COLE CONNECTION

Ron DeWeese, President of American Key, was hired by Cole in 1974 as an Assistant District Manager responsible for managing certain key shops in the southeastern United States. Mr. DeWeese, while still a Cole employee, attempted to operate a key shop of his own, but sold his interest when his supervisor at Cole discovered this conflict of interest. When Cole officials discovered that DeWeese had opened a second key shop in downtown Atlanta, he was immediately discharged. DeWeese understandably should have had knowledge of the personnel at both Cole and Sears as a result of his role as Cole's assistant district manager.

### THE FORMATION OF AMERICAN KEY

American Key was formed in August 1976 with an initial capital contribution of $500. From its inception, Ron DeWeese has been its president and principal shareholder. American Key took over the operation of Mr. DeWeese's key shop in downtown Atlanta. Since its formation, American Key has attempted to operate small key duplicating facilities in shopping malls or other retail locations in the Atlanta area and a few other locations in the Southeast. At one time it had facilities at 16 different locations. American Key has operated with a marked lack of success.

American Key filed for bankruptcy on June 22, 1981. In the bankruptcy petition, American Key stated that it had $1.16 million in unsecured and secured debts (of which $1 million dollars constituted a claim by Mr. DeWeese and his wife for $500,000 each in alleged unpaid salary), with total assets of about $65,000. American Key also listed seven disputed claims with mall owners or operators where American Key owed rent which it has refused to pay.

### THE STATE COURT PROCEEDINGS

In 1977, American Key rented space for a key shop in Cumberland Mall through Carter & Associates, Inc. (hereinafter "Carter"), rental agent for the mall. There was a Sears store at Cumberland Mall with a Cole-operated key shop located in it. American Key encountered no difficulty in leasing space at Cumberland. When American Key's operation experienced financial difficulties, Carter agreed to reduce American Key's rent. On four separate occasions in the latter half of 1979 and the early part of 1980, American Key's checks were returned because of insufficient funds. Carter elected not to renew American Key's lease at the end of the term. A new tenant willing to pay $500 more per month in base rent than American Key was paying, in addition to the usual percentage rental, was obtained to replace American Key.

As an accommodation to American Key, Carter and Cumberland agreed to allow it to remain in Cumberland Mall for 30 days beyond its lawful term. A special 30-day lease was drawn up and given to Mr. DeWeese for his signature on behalf of American Key. However, the document Mr. DeWeese returned to Carter was a different document than the one he had been given. The document returned by Mr. DeWeese had been retyped and was identical in all respects to the one he had been given except that the term of the lease had been changed from 30 days to 30 years. Carter detected the alteration and, believing that it was a deliberate act of deception, demanded that American Key leave immediately. American Key refused to do so, and on April 28, 1980 Carter filed a dispossessory action against American Key in the Cobb County State Court. As above recited, American Key filed the present antitrust suit against Carter and Cumberland Associates on May 6, 1980.

## AMERICAN KEY'S MALL LOCATIONS

American Key was not excluded from malls operated by Carter and/or Cumberland. At Northlake Mall American Key was given a kiosk location that was profitable at least as long as Carter had an interest in the mall. At Southlake Mall, Carter refused to grant plaintiff a kiosk location in a corridor but did offer American Key in-line space which American Key refused. American Key was also denied a corridor location for a kiosk at Cumberland Mall but was instead first offered in-line space and then a kiosk space in the Paces Crossing section. Carter and Cumberland, at least initially, regarded American Key as a desirable tenant and made efforts to accommodate American Key.[3]

## THE ALLEGATIONS OF THE COMPLAINTS

The original complaint alleged that Carter and Cumberland Associates, owners of the mall, conspired with unnamed others to injure American Key in violation of the anti-trust laws.

On January 27, 1981, after an eight month delay, during which time American Key conducted little discovery, American Key moved for leave to file an amended complaint, adding Mr. DeWeese as a plaintiff in his individual capacity as president and major stockholder of American Key, and, as recited, adding Cole and Sears as defendants. The amended complaint sought treble damages of over $105 million. The court granted the motion for leave to amend on March 5, 1981.

American Key alleged that Sears, Cole, and the other defendants conspired among themselves and with others to keep American Key out of regional enclosed malls having two or more anchor tenants and 500,000 or more square feet of retail selling space. Count One alleged that the defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to deny renewal of American Key's lease at Cumberland Mall and by refusing to rent to American Key at Southlake Mall. The failure to renew and refusal to rent was allegedly done pursuant to an antitrust conspiracy for the purpose of monopolizing or attempting to monopolize the sale of keys at regional enclosed shopping malls in the Atlanta area in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Count Two was addressed to the business relationship between Cole and Sears. American Key alleged that Cole and Sears "have an agreement whereby Cole has the exclusive right to operate the key shops located ... in all or nearly all Sears stores which are located in regional enclosed mall shopping centers (with a minimum of 500,-000 square feet of retail floor space and at least two major anchor tenants) in the Atlanta Metropolitan Area, as well as in such locations in the state of Georgia, the Southeastern United States, and the United States." Count Two also suggested that the arrangements between Sears and Cole relating to Cole National's "Things Remembered" stores were improper, because they agreed the price for duplicating keys and other competing services will be identical in both key shops and Sears will be reimbursed for lost revenue of the Sears store as a result of competition from the "Things Remembered" shop in the same mall.

## THE DISCOVERY ISSUE

■ One of American Key's principal points on appeal is that it was denied an effective opportunity to conduct discovery.

---

**3.** The evidence shows that American Key was able to set up its kiosks in shopping malls containing both a Sears with a Cole-operated keyshop and a "Things Remembered" store. The record also shows that Cole was denied space for a "Things Remembered" store in at least one shopping mall containing an American Key kiosk despite the fact that Sears was already present. The evidence also shows that American Key could have entered more malls than it did if it had wanted to do business in a format other than the kiosk format. American Key has failed to show that the licensing agreement and/or the rebate agreement between Cole and Sears had any effect on the ability of either American Key or any other competitor to compete in the relevant market.

In resolving this issue we are guided by two controlling principles (1) a district court "has broad discretion in all discovery matters," *Wyatt v. Kaplan,* 686 F.2d at 283, and (2) the difference between an opportunity to conduct discovery and a failure "to make use of that opportunity." *See, Parrott v. Wilson,* 707 F.2d 1262, 1270 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

Discovery in this case included depositions and the production of a sizable quantity of documents. American Key allowed the four-month discovery period prescribed in the local rule to expire more than once and the district court granted extensions of the discovery period, subject later to certain conditions. Discovery finally ended on November 4, 1981, although the district court permitted additional discovery thereafter.

The suit was initially filed, as indicated, on May 6, 1980, against defendants Cumberland Associates and Carter & Associates alleging that they had conspired to violate the antitrust laws by refusing to renew a lease possessed by American Key. Judge Tidwell, to whom the case was initially assigned, denied American Key's motion for a temporary restraining order on June 19, 1980.

When the original complaint was filed, American Key requested and received documents from the original defendants, Carter and Cumberland. Notwithstanding the mandate of Local Rule 181.11[4] that discovery be completed within four months and the admonition of Local Rule 181.12[5], American Key let the time for discovery expire with no requests for extension. Plaintiff did nothing further in the case until January 1981, when it sought to add Sears and Cole to the case.

Cole filed its answer on May 1, 1981, and Sears filed its answer on May 5, 1981.

During the ensuing four-month discovery period provided by the Local Rule, American Key did not notice any depositions of any representative of Cole. It did, however, conduct other forms of discovery by interrogatories and requests for documents. American Key offers no explanation for its failure to conduct deposition discovery during this period. DeWeese, in his affidavit as President of American Key, recounted his familiarity with Cole's operation including its shops in Sears when he served as district manager of Cole. He presumably would have knowledge of persons to be deposed to support any antitrust claim.

On September 4, 1981, Judge Tidwell entered an order over Cole's objection extending the discovery period for an additional two months, until November 4, 1981. American Key was, therefore, provided a full eight months to conduct discovery from the filing of the amended complaint. During this crucial period, American Key did not take any depositions. By the end of that extended discovery period on November 4, 1981, Sears and Cole had produced a great quantity of documents to American Key. They had, however, objected to certain parts of American Key's broad discovery requests on a number of grounds.

On September 4, 1981, American Key filed a motion to compel claiming that Cole's and Sears' efforts to limit discovery to the Atlanta area (where Cumberland Mall is located) and to events occurring after June 1, 1976, the year of American Key's incorporation, were unduly narrow. When the extension for the discovery period expired in November, there remained only a motion to compel production of a few limited categories of documents.

On December 11, 1981, Judge Tidwell granted the motion to compel in part, and

---

**4.** Local Rule 181.11 of the Northern District of Georgia provides:

Any desired discovery procedure shall be commenced promptly, pursued diligently and completed without unnecessary delay and within four months after the filing of the answer unless for cause shown the time has been extended by the Court.

**5.** Local Rule 181.12 of the Northern District of Georgia provides:

No extension of time for discovery shall be granted by the Court unless an order to such effect is entered by the Court prior to the expiration of such period.

denied it in part. He ordered the defendants to produce documents limited to the southeastern portions of the United States (rather than nationwide as American Key claimed) for the period after 1971 (rather than 1960 as American Key had demanded).

The production of the additional documents by Cole to American Key was completed on February 3, 1982. Sears completed its production of the additional documents on February 15, 1982.[6] On February 1, Judge Forrester, to whom the case had been reassigned, held a status conference. At that conference, American Key disputed Judge Tidwell's ruling and claimed that it required nationwide discovery to address the alleged conspiracy even though it had only done business in the Southeastern United States and primarily in the Atlanta area.

Judge Forrester reaffirmed Judge Tidwell's discovery ruling. Two years had passed since the case was filed (and almost) a year since Cole and Sears were added as defendants. The extended discovery period had expired three months earlier. Although American Key had not attempted to depose any witnesses, its counsel then announced that he needed to take numerous depositions. The defendants objected to this attempt to reopen discovery.

The district court balanced the need to enforce compliance with the Local Rules governing discovery, and the prejudice to the defendants if discovery were allowed to continue indefinitely. It also weighed the possible prejudice to the plaintiffs if they were not allowed to reopen discovery to take depositions that they could have taken during the discovery period. In doing so, the court ruled that, if the documents produced after November 4, 1981, raised any new subjects not shown by the documents previously produced by Cole and Sears, American Key could seek additional discovery by submitting a discovery plan demonstrating what additional discovery was needed based upon the newly-produced documents.

On February 18, 1982, plaintiffs presented a "discovery plan" which was totally inconsistent with Judge Forrester's ruling. American Key requested depositions of a long list of witnesses and made no attempt to justify the discovery requests based on new matters disclosed by the final production of documents.

Cole and Sears objected to American Key's new proposed "discovery plan" and Judge Forrester entered an order on June 28, 1983, stating:

> (Plaintiffs') proposed plan does not comport with the directions of the court that plaintiffs' requests for further discovery state specifically how these requests tie into matters raised by the documents produced pursuant to the court's December order, nor does it comport with the directions of the court that plaintiffs identify the persons to be deposed.

Nevertheless, Judge Forrester permitted American Key a further opportunity to reformulate its discovery plan in compliance with the court's direction.

American Key filed a second proposed discovery plan on July 30, 1982. In response, Cole demonstrated, with respect to each document and each person cited by American Key, that the identity of the witness and the subject had been disclosed in earlier discovery responses, and that no additional discovery was justified. The court, on November 1, 1982, properly denied the requested discovery against Cole.

The court, however, ruled that two new documents produced by Sears in February related to relevant issues in the lawsuit, and granted American Key 30 days to depose the author of those documents and his secretary. American Key elected to take only the deposition of the author, Mr. Strauss, in Chicago.

American Key was free for almost two years following the filing of the original

---

**6.** The documents relating to the Atlanta operations for the years that American Key had been in business had already been produced in August well before the expiration of the discovery period.

complaint and for eight months after the filing of the amended complaint to conduct discovery. Indeed, testimony from Cole and Sears could have been elicited at any time after the filing of the action in May, 1980 by use of a subpoena. As earlier observed, DeWeese had knowledge of the relationship with, and personnel in, Cole and Sears from his previous position as general manager of Cole. American Key offers no explanation for not pursuing discovery when the opportunity to do so existed.

The discovery deposition of American Key was noticed by the adverse parties the next day after service. Numerous documents were produced to American Key and its interrogatories were answered. Despite the four months limitation, unless extended during that period, American Key was allowed to conduct discovery for the equivalent of four such periods and was then granted a formal 60 day extension to do so. A trial judge has broad discretion to control the course of discovery, especially in a complex anti-trust case as was this one. *National Independent Theatre Exhibitors, Inc. v. Buena Vista Distribution Company,* 748 F.2d 602 (11th Cir., 1984). We hold the district court did not abuse its discretion in the entry of its discovery orders.

## THE SUMMARY JUDGMENT ISSUE

■ American Key in its brief only assails the action of the district court in determining the relevant product and geographic markets as a matter of law. It also contends that the relevant product market was "key duplicating shops operated in high traffic areas in enclosed regional malls having 500,000 or more square feet and at least two major anchor tenants," because replacement keys are bought "on impulse."

The Court properly held there was no dispute that the relevant product market is "replacement of keys and related items."

*See, Standard Oil Co. v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

## THE DISTRICT COURT HOLDING

In its well-reasoned order, supported by undisputed evidence, the district court also held that, considering the patterns of trade, replacement keys and related items are available to customers not only in large regional shopping malls but also in free-standing hardware stores, variety stores, drug stores and locksmiths. Accordingly, the Court found "no basis for defining the geographic market as large shopping malls."

The Court also found (a) there was no competent evidence of any conspiracy to or attempt to monopolize or engage in any other antitrust violation and (b) the relationship between Sears and Cole was lawful and proper.

■ The district court further determined that it would be violative of the basic right of businessmen to select with whom they will do business and the terms and conditions on which they will do business, to hold that, (1) Sears could not enter into an exclusive agreement to deal with Cole in the operation of key duplicating shops in Sears' own premises or (2) shopping center managers should be required to allow kiosks. We agree.

The antitrust laws do not compel a company to do business with anyone or to adjust the mix of mall tenants. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *See also, Wilson v. I.B.E. Industries, Inc.,* 366 F.Supp. 1171, 1172 (E.D.Tex.1973).

■ As indicated, American Key assails only the determination by the Court of the relevant product and geographic markets.[7] American Key offered no substantial factual basis for the conclusory opinion

---

7. A precise definition of the geographic market is required, not space within regional shopping centers. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961). *RCM Supply Co. Inc. v.*

*Hunter Douglas, Inc.,* 686 F.2d 1074, 1077 n. 4 (4th Cir.1982); *The Deauville Corp. v. Federated Department Stores,* 1983–2 Trade Cas. (CCH) ¶ 65, 599 (S.D.Tex.1983).

of its expert. It did not challenge other rulings by the district court that were adverse to it. These included (1) American Key's failure to adduce any evidence of "harm to competition" or any "significant probative evidence" of an illegal combination or conspiracy involving Sears, (2) failure to show that Sears and Cole had monopoly power, and (3) failure to demonstrate that either Sears or Cole had a specific intent to monopolize. Each of these elements is dispositive of one or more of American Key's assertions that Sears and Cole violated Sections 1 and 2 of the Sherman Act.[8]

Having failed to raise any of these antitrust issues on appeal, they are deemed abandoned.[9]

■ The district court correctly held in its Summary Judgment Order that:

> [s]imply because plaintiff regards [regional] shopping malls [with over 500,000 square feet of leaseable area and at least two major anchor tenants] as the best or ideal locations for selling his product *in his format* does not mean that they are the only or even the predominate "area in which the sellers of the particular product or service operate."

(emphasis in original)

Proof of the relevant product and geographic market is absolutely essential to appellants' Section 2 claims. *See,* 3 Von Kalinowski, *Antitrust Laws and Trade Regulation,* §§ 8.02[1], 9.01[1] (1983); *In*

*re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d at 441.

■ American Key failed to produce any admissible evidence, as required by Rule 56(e), that creates triable issues of fact with respect to the existence of a cognizable market or Sears' or Cole's monopoly power in such a market.

The above rule requires that affidavits submitted in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence...." *See,* 10A Wright, Miller, Kane, *Federal Practice and Procedure: Civil 2d,* § 2738 (1983) at 470–473. Neither DeWeese's nor Henry's affidavit meets this standard. We find the district court properly gave little weight to DeWeese's and Henry's affidavits.

DeWeese affidavit did not offer any admissible evidence concerning the relevant geographic market or Sears' or Cole's monopoly power in such a market. DeWeese attempted to construct a relevant economic market based upon the sale of replacement keys in regional shopping malls having a minimum of 500,000 square feet of retail space and at least two major anchor tenants. Construction of a relevant economic market or a showing of monopoly power in that market cannot, however, be based upon lay opinion testimony. *Forro Precision, Inc. v. International Business Machines Corp.,* 673 F.2d 1045, 1059 (9th Cir.

---

**8.** Harm to competition is a necessary element of all private antitrust suits under Sections 1 and 2 of the Sherman Act, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); significant probative evidence of a conspiracy is an essential element of all Section 1 violations and of a conspiracy to monopolize in violation of Section 2, *First National Bank v. Cities Service Co.,* 391 U.S. at 290, 88 S.Ct. at 1593, 3 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 9.02[2]–[3] (1983); specific intent to monopolize is a necessary element of a Section 2 offense of actual monopolization, *Id.* at § 9.01(1). Monopoly power is a critical element of a Section 2 offense of actual monopolization, *Id.* at § 8.02(1).

**9.** *See, Fed.R.App.P.* 28(a)(4); *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d

436, 439 n. 6; *Harris v. Plastics Manufacturing Co.,* 617 F.2d 438, 440 (5th Cir.1980) (failure to discuss an issue in an appellant's argument portion of its brief results in abandonment of the issue on appeal). *See also, Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, —— n. 7, 104 S.Ct. 1464, 1469 n. 7, 79 L.Ed.2d 775 (1984). *First National Bank v. Cities Service Co.,* 391 U.S. at 290, 88 S.Ct. at 1593; *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436 (5th Cir.1982); *Joe Regueira, Inc. v. American Distilling Co., Inc.,* 642 F.2d 826, 832 (5th Cir. Unit B, 1981). 7 Von Kalinowski, *Antitrust Laws and Trade Regulation,* §§ 58.02(1), 9.01(1) (1983); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230, 237 (N.D.Cal.1981), *aff'd.,* 677 F.2d 47 (9th Cir.) *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

1982); *Cal Distributing Co. v. Bay Distributors, Inc.*, 337 F.Supp. 1154, 1158 (M.D.Fla.1971). This contention, without support, is likewise insufficient to raise an issue of fact. *See, Dunn & Mavis, Inc., v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 244 (6th Cir.1982); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 296 (7th Cir.1974); *Joseph Ciccone & Sons v. Eastern Industries, Inc.*, 559 F.Supp. 671, 674 (E.D.Pa. 1983); *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F.Supp. 954, 959 (M.D.Pa.1981); *Cal Distributing Co. v. Bay Distributors, Inc.*, 337 F.Supp. 1154, 1158 (M.D.Fla.1971).

■ Neither does Dr. Henry's affidavit create a material issue of disputed fact with respect to the relevant market or any other issue in this cause. The "facts" in that affidavit are based entirely on DeWeese's inadmissible lay testimony. Henry spot checked DeWeese's extract, but did nothing to verify the "facts" submitted to him by DeWeese.

An expert witness's opinion testimony does not have to be based upon admissible evidence. Such opinions, however, must be based upon "facts or data ... of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." *Fed.R. of Evid.* 703. Henry's affidavit does not state that he, as an economist, would normally base his opinions on information of the type furnished to him by DeWeese. Henry's affidavit expressly states that it is based upon a "Statement of Facts" submitted to him by American Key, DeWeese's affidavit and an extract prepared by American Key.

■ Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not. *Perma Research & Development v. Singer Co.*, 542 F.2d 111, 121 n. 8 (2d Cir.1976) (dissent), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976); *6816.5 Acres of Land v. United States*, 411 F.2d 834, 839–840 (10th Cir.1969); *Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir.1966); *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 855–856 (M.D.Tenn.1974).

■ An expert's opinion that lacks any credible support does not create an issue of fact. *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 n. 27 (D.C.Cir. 1977).

In further support of its contention that the relevant product market is "key duplicating shops in regional high-traffic malls with at least two major anchor tenants," American Key argues monopolization by discussion of cross elasticity of demand for *keys*, not suitable space.

■ To establish that the relevant product market consisted of space in regional malls suitable for the sale of replacement keys and not any space in which replacement keys can be sold, e.g., hardware stores and free standing department stores as well as regional malls, American Key was required to introduce evidence of the "cross elasticity of demand" for these two "products." *United States v. E.I. du Pont de Nemours, & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). American Key's affidavits fail to demonstrate any cross-elasticity of demand for any product.

■ American Key asserts that the relevant geographic market is limited to "the sale of replacement keys and related items in high customer traffic areas in regional enclosed shopping malls having a minimum of 500,000 square feet of retail space and at least two anchor tenants," and that the district court erred in ruling that the relevant geographic market was not so limited.

The district court correctly rejected American Key's highly artificial definition of the relevant geographic market. The court properly ruled that the geographic market consists of the area from which sellers of replacement keys derive their customers, and the area within which purchasers of keys can practically turn for such products or services. Thus, the court held that the antitrust laws "do not protect a right of a party to do business in any format that he chooses but rather protects competition between suppliers of similar goods and services in a variety of formats."

In rejecting American Key's artificially narrow definition of the relevant geographic market, the district court relied on undisputed evidence which showed that sellers of replacement keys regularly operate not only in enclosed shopping malls with 500,000 square feet, but also in open shopping centers, shopping malls with less than 500,000 square feet, and strip shopping centers, as well as in hardware stores, variety stores, and drugstores. Affidavit of Boake A. Sells, ¶ 4, R. 683–84. Replacement keys are also sold by locksmiths. Order, p. 26, R. 1289. Indeed, American Key itself operated key duplicating shops in a variety of different formats. See Exhibit "A." Thus, the fact that Cole leases the key concession in Sears stores does not prevent competitors in the replacement key business from opening key shops in a variety of other locations and competing with Cole for the same business.

■ American Key argues that Cole's documents recognize this peculiar market definition. These leasing practices related to Cole's "Things Remembered" stores which are primarily gift shops that feature engraved ("personalized") gift items. Some, but not all, "Things Remembered" stores sell a "short line" of replacement keys only as an incidental item and are located in large malls. These "Things Remembered" stores are significantly different from the specialized full-line key shops that Cole operates in Sears stores. The fact that Cole may have chosen malls as desirable facilities does not define the relevant geographic market for antitrust purposes. See, The Deauville Corp. v. Federated Department Stores, 1983–2 Trade Cas. (CCH) ¶ 65,539 (S.D.Tex.1983); RCM Supply Co. v. Hunter Douglas, Inc., 686 F.2d 1074, 1077 (4th Cir.1982).

[18] The relevant market is the "area of effective competition" in which competitors generally are willing to compete for the consumer potential, and not the market area of a single company. Tampa Electric Company v. Nashville Coal Co., 365 U.S. 320, 327–29, 81 S.Ct. 623, 627–29, 5 L.Ed.2d 580 (1961); United States v. Philadelphia National Bank, 374 U.S. 321, 359, 83 S.Ct. 1715, 1739, 10 L.Ed.2d 915 (1963).

Common sense suggests that replacement key facilities operated in regional shopping malls compete with similar facilities operated (i) in hardware stores, (ii) by independent locksmiths, (iii) in free-standing department stores and (iv) in department stores located in smaller shopping centers, as well as with key shops in other large regional shopping malls. See Kinnett Dairies, Inc. v. Dairymen, Inc., 512 F.Supp. 608, 639 (M.D.Ga.1981), aff'd, 715 F.2d 520 (11th Cir.1983); Tampa Electric Co., 365 U.S. at 327, 81 S.Ct. at 627.

The district court properly held that the relevant geographic market in the replacement key business was not limited to large regional enclosed mall shopping centers since "meaningful competition" existed in other areas which must also be included in any definition of the relevant market.

■ American Key has not submitted any evidence that would permit a jury to find that either Cole or Sears possessed any power (monopoly or otherwise) over the key replacement business in "regional enclosed mall shopping centers of 500,000 or more square feet and two major anchor tenants." Cf. Kreager v. General Electric Co., 497 F.2d 468, 471 (2d Cir.1974).

■ "Monopoly" power exists in a geographic market if one competitor has the power to raise prices to supra-competitive levels or has the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market. See United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

American Key presented no facts showing that Cole or Sears had (much less exercised) the power to exclude other key operators from even one "regional enclosed mall shopping center," much less all such shopping centers. Nor is there any evidence that Cole or Sears have the power to charge supra-competitive prices for the replacement keys.

WE AFFIRM.